**MONTGOMERY WARD & CO., INCORPORATED, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 81-7421.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 16, 1982.

Decided Nov. 9, 1982.

**1324**

Newton N. Minow, Sidley & Austin, Chicago, Ill., for petitioner.

Linda A. Heary, Jerold D. Cummins, F.T.C., Jerold D. Cummins, Washington, D.C., for respondent.

Before KILKENNY and HUG, Circuit Judges, and BROWN *, District Judge.

* The Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation.

1. For clarity's sake, the Federal Trade Commission for most purposes is labeled "the FTC." In its function as an appeal board, however, it is referred to as "the Commission."

2. 16 C.F.R. § 702.3 reads, in pertinent part:
 The following requirements apply to consumer products actually costing the consumer more than $15.00:

HUG, Circuit Judge:

Montgomery Ward & Co., Incorporated ("Wards") appeals a Federal Trade Commission ("Commission" or "FTC")[1] ruling that Wards violated 16 C.F.R. § 702.3 (1982) by failing to provide potential customers with ready access to written warranty information prior to the sale of merchandise priced at over fifteen dollars. As a result of its ruling, the Commission entered a cease and desist order enjoining Wards from further violations.

On appeal, Wards argues that the Commission's ruling is not based on substantial evidence, that the ruling is an abuse of discretion because it calls for a standard of conduct that is markedly different from the language of the regulation, that the entry of a cease and desist order is inappropriate, and that the order is too vague to be enforceable.

I

FACTS

Wards is a chain of approximately 650 retail department and catalog stores. As a retail seller, Wards is affected by the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301–12 (the "Act"), which provides, in part, that the FTC "prescribe rules requiring that the terms of any written warranty ... be made available to the consumer (or prospective consumer) prior to the sale of the product ...." 15 U.S.C. § 2302(b)(1)(A).

Using that grant of authority, the FTC promulgated the pre-sale availability rule ("pre-sale rule" or the "rule"), which appears at 16 C.F.R. § 702.3.[2] The pre-sale

(a) *Duties of the seller.* Except as provided in paragraphs (c) through (d) of this section, the seller of a consumer product with a written warranty shall:
 (1) Make available for the prospective buyer's review, prior to sale, the text of such written warranty by the use of one or more of the following means:
 (i) Clearly and conspicuously displaying the text of the written warranty in close conjunction to each warranted product; and/or

rule provides sellers with four alternative methods to make warranty information available to consumers. Wards decided to use the method set out at section 702.-3(a)(1)(ii), the binder option.[3]

In an effort to meet the requirements of the binder option, Wards's management developed a program of warranty binder distribution and maintenance, which was implemented shortly before the January 1, 1977 effective date of the pre-sale rule. In addition to normal management oversight, Wards included compliance with the warranty binder program as part of its internal auditing procedure.

To implement its binder program, Wards delivered three sets of binders and from two to eight informational signs (depending on store size) to each store during November, 1976. Over the next three months, an additional 1,100 signs were sent to the stores upon individual requests. The store managers were instructed to place signs at the location of the binders and in prominent areas in the appliance department, the main entrance/exit of the store, and near escalators or elevators. The binders were to be placed at the Customer Accommodation Center (an information and service desk), in the automotive department (often a separate building), and at a third location on a floor not already containing a binder. The specific location was left to the store manager's discretion because of lack of uniformity in store layouts.

Toward the end of 1977, FTC investigators surveyed a number of Wards's stores to check compliance with the rule. Numerous violations were found, including the failure to post signs, the failure to have the binders available upon request, and the failure of employees to direct questioning customers to the binders.[4]

In February, 1978, the FTC informed Wards that it was not in full compliance with the pre-sale rule. In response, Wards repeated its initial sign distribution, stepped up the priority of compliance on its internal audit schedule, and sent additional memos to its store managers emphasizing the im-

(ii) Maintaining a binder or series of binders which contain(s) copies of the warranties for the products sold in each department in which any consumer product with a written warranty is offered for sale. Such binder(s) shall be maintained in each such department, or in a location which provides the prospective buyer with ready access to such binder(s), and shall be prominently entitled "Warranties" or other similar title which clearly identifies the binder(s). Such binder(s) shall be indexed according to product or warrantor and shall be maintained up to date when new warranted products or models or new warranties for existing products are introduced into the store or department by substituting superseding warranties and by adding new warranties as appropriate. The seller shall either:

(A) Display such binder(s) in a manner reasonably calculated to elicit the prospective buyer's attention; or

(B) Make the binders available to prospective buyers on request, and place signs reasonably calculated to elicit the prospective buyer's attention in prominent locations in the store or department advising such prospective buyers of the availability of the binders, including instructions for obtaining access; and/or

(iii) Displaying the package of any consumer product on which the text of the written warranty is disclosed, in a manner such that the warranty is clearly visible to prospective buyers at the point of sale; and/or

(iv) Placing in close proximity to the warranted consumer product a notice which discloses the text of the written warranty, in a manner which clearly identifies to prospective buyers the product to which the notice applies;

(2) Not remove or obscure any warranty disclosure materials provided by a warrantor, except:

(i) Where such removal is necessary for store window displays, fashion shows, or picture taking; or

(ii) Where the seller otherwise, through means provided for in paragraph (a)(1) of this section, makes the terms of the warranty information available to the consumer.

3. The rule does not require a seller to use only one of the four options. The only requirement is that, for each covered product sold, at least one of the four allowed methods must be used. It is logical to expect most sellers, as a matter of administrative efficiency, to rely on one method to the exclusion of others.

4. Although expressly not relied upon by the Commission in reaching its final decision, Wards's own audits indicated violations of its corporate compliance program.

portance of compliance with the rule. In addition, Wards introduced a new sign program in June, 1978, involving the distribution of ten to twenty-five signs per store, to be affixed to cash registers in areas where covered products were sold.

Despite these efforts, the FTC believed Wards's compliance to be insufficient. In September, 1978, it issued a complaint alleging that Wards had failed to make written warranty materials available to consumers prior to sale, in violation of the Act and the pre-sale rule.[5]

## II

## THE DECISION BELOW

After extensive hearings, an administrative law judge ("ALJ"), on December 19, 1979, held Wards to be in violation of the rule and the Act, and issued a cease and desist order. Both parties appealed to the Commission, which, after modification, affirmed the ALJ's order on April 30, 1981.

### A. *Ready Access to Warranty Binders.*

The Act requires that written warranty terms be made available to consumers and potential consumers prior to the sale of covered products. 15 U.S.C. § 2302(b)(1)(A). The pre-sale rule, under the binder option, requires that warranty binders be made available in each department selling covered products, "or in a location [providing] ready access" to the binders. 16 C.F.R. § 702.3(a)(1)(ii) (fully set out at footnote 2, *supra* ).

The FTC, in the proceedings below, urged that this section means that a binder must be placed in every department selling covered goods. The ALJ rejected the FTC's position as contrary to the language of the regulation. Indeed, as the Commission noted in its decision, the FTC's interpretation had been expressly rejected during the rule-

making proceedings leading to the promulgation of the pre-sale rule. *See* 40 Fed. Reg. 60,168, at 60,183 (1975).[6]

The ALJ and the Commission agreed that providing prospective consumers with ready access to the warranty binders requires, for large retailers, that one set of binders must be available on each selling floor. Wards was held to be in violation of this requirement and was ordered to comply.

### B. *Location of Signs.*

The binder option also requires a seller to provide notice of the availability of the binders by placing "signs reasonably calculated to elicit the prospective buyer's attention in prominent locations in the store or department . . . ." 16 C.F.R. § 702.-3(a)(1)(ii)(B). The ALJ focused on the "reasonably calculated" language and concluded that signs are required in reasonable proximity to the point of sale.

The ALJ based his proximity conclusion on an analysis of the other three compliance options. He noted that all three have some explicit proximity or "point of sale" requirement. *See* footnote 2, *supra.* He concluded, therefore, that the "reasonably calculated" language, when read in the context of the other options, means that the signs must be "in sufficient proximity to the point of sale so that buyers are likely to see such notice before making their purchases." The ALJ's order requires Wards to place signs on all cash registers in departments selling goods covered by the rule. He reasoned that signs in such prominent locations at the point of sale would be an excellent way to elicit the prospective buyer's attention.

The FTC argued that the signs should be near the products, as opposed to the point of sale. The ALJ rejected that approach, noting that the purpose of the rule is to make warranty terms available prior to the

---

5. The FTC's complaint also alleged, in a separate count, that Wards had failed to provide sufficient warranty information to its stores. At the administrative hearing, however, no proof was offered on those charges. The count was later dismissed.

6. Even if the FTC's reading of the rule had not been rejected previously, we would not be able to adopt it, as it would vitiate the alternative nature of the rule by making meaningless the language after the "or."

sale. He concluded that the rule makes no requirement that the signs or binders be visible to the prospective buyer during examination of the product.

The Commission rejected the ALJ's analysis, with the observation that by the time a customer approaches the cash register, the purchasing decision usually already has been made; thus the notification is no longer pre-sale, and the purpose of the rule is not accomplished. The Commission ordered that, if Wards put one set of binders on each floor rather than in each department, it must place signs "in a *prominent location in each department* of each retail establishment where warranted products are sold, in a manner reasonably calculated to elicit the prospective buyer's attention. If two adjacent departments share a wall, one sign may be placed on that wall." (Emphasis added).[7]

### III

### DISCUSSION

#### A. *Substantial Evidence.*

■ The Federal Trade Commission Act, at 15 U.S.C. § 45(c), states that "findings of the Commission as to the facts, if supported by evidence, shall be conclusive." This language has been judicially interpreted to mean that the FTC's findings of fact are to stand inviolate on review if supported by substantial evidence. *Ash Grove Cement Co. v. FTC,* 577 F.2d 1368, 1377–78 (9th Cir.), *cert. denied,* 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

Wards contends that the Commission's conclusion that it was not in compliance with the pre-sale rule is not supported by substantial evidence. The FTC presented a large amount of testimony from its investigators that showed violations of both the sign placement and binder availability requirements. The crux of Wards's position seems to be that the Commission erred in crediting the investigator's testimony over the rebuttal evidence Wards presented.

As the Fifth Circuit once indicated, substantial evidence to support an agency finding of fact may exist "even though suggested alternative conclusions may be equally or even more reasonable and persuasive." *Colonial Stores, Inc. v. FTC,* 450 F.2d 733, 739 (5th Cir.1971) (adopted by this court in *Ash Grove,* 577 F.2d at 1378). Thus, while we acknowledge that the evidence presented by Wards did, in some instances, persuasively rebut the FTC's showing of violations, we are satisfied that the Commission's factual findings were supported by substantial evidence.

Our conclusion, however, is tempered by the problems presented by the remaining issues in this appeal. We are sympathetic to Wards's observation that its substantial evidence argument is hampered by the fact that it was presenting evidence of its good faith compliance with the plain language of the pre-sale rule, while the FTC was demonstrating that Wards was in violation of a new version of the rule that never before had been stated.[8] Because of our ultimate conclusion in this case, we do not address the question whether Wards's efforts to comply with the express terms of the rule were successful.

#### B. *The Standard of Conduct—Interpretation v. Amendment.*

Wards contends that the Commission's decision was not the mere fleshing out of a general rule through its application to specific facts. Wards urges that the Commission has instead fashioned a new rule and retroactively applied it, thus invalidating

---

7. Compare the emphasized language in the Commission's order with the language of the rule: "prominent locations in the store or department ...." 16 C.F.R. § 702.3(a)(1)(ii)(B).

8. The FTC acknowledged this problem in a footnote to its brief, discussing the admissibility of Wards's internal audit records: "the [FTC's] investigators were not necessarily checking the same things as [Wards's] auditors ...."

Wards's efforts to comply with the old one. Wards contends that creation of a new rule is proper only through formal rule-making procedures, and that the Commission's decision, therefore, was an abuse of discretion.[9]

### 1. Judicial Review

■ It is well settled that the decision whether to proceed by adjudication or rule-making "lies in the first instance within the [agency's] discretion." *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974). Such a grant of discretion, however, does not preclude judicial review when that discretion has been abused. The "scope of review" section of the Administrative Procedure Act requires that a reviewing court "set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion. . . ." 5 U.S.C. § 706(2)(A). *See Phelps Dodge Corp. v. Federal Mine Safety and Health Review Commission,* 681 F.2d 1189, 1192 (9th Cir.1982) (applying section 706(2)(A)). We must decide, therefore, whether the Commission's decision amended the pre-sale rule in such a way that the use of adjudication to achieve that end constituted an abuse of discretion.

### 2. Developing the Law Through Adjudication

The Supreme Court has consistently ruled that new administrative policy may be announced and implemented through adjudication. In *SEC v. Chenery Corp.,* 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947), the Court noted:

> Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule

or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.

*Chenery* involved securities trading by management during the reorganization of a public utility holding company. The SEC's order restricted management's ability to profit from its trading. The defendants protested that the SEC's adjudicatory decision had invented a new standard of conduct and retroactively applied it to their detriment. The Court, however, rejected their position:

> [W]e refuse to say that the Commission, which had not previously been confronted with the problem of management trading during reorganization, was forbidden from utilizing this particular proceeding for announcing and applying a new standard of conduct. That such action might have a retroactive effect was not necessarily fatal to its validity. Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency. But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law.

*Chenery,* 332 U.S. at 203, 67 S.Ct. at 1580–81 (citations omitted).

■ Thus, when a new problem is presented to an administrative agency, the agency may act through adjudication to clarify an uncertain area of the law, so long as the retroactive impact of the clarification is not excessive or unwarranted.

While the general policy considerations raised in *Chenery* are fundamental to an analysis of the propriety of an agency's adjudicatory lawmaking, its result is not controlling. The case at hand does not involve the filling of a void in the law. Here, a rule, describing in some detail the required conduct, recently had been promul-

---

9. The procedures for rulemaking and adjudication by administrative agencies are set out in the Administrative Procedure Act 5 U.S.C.

§§ 553 and 554, respectively. Section 553 is slightly modified by the rule-making authorization section of the Act. 15 U.S.C. § 2309.

gated, and Wards arguably had acted in reliance on the plain meaning of that rule. This case involves an adjudicatory restatement of previously articulated law.

While the Supreme Court has addressed adjudicatory changes in administrative case law,[10] and adjudicatory interpretations of "law" developed in administrative manuals,[11] we have not been directed to, nor does there appear to be, any case where the Court has addressed an adjudicatory change in a recently promulgated rule.

3. *Changing Rules Through Adjudication*

 The issue is whether an adjudicatory restatement of the conduct required by a rule is an interpretation or an amendment of the rule. Adjudication allows an agency to apply a rule to particular factual circumstances and to provide an interpretation of the required conduct in light of those circumstances. An adjudicatory restatement of the rule becomes an amendment, however, if the restatement so alters the requirements of the rule that the regulated party had inadequate notice of the required conduct.[12] An amendment is proper only when adequate notice is provided to affected parties pursuant to appropriate rule-making procedures. *See* 5 U.S.C. § 553 (rule-making as required by the Administrative Procedure Act); *Ruangswang v.*

*INS,* 591 F.2d 39, 45 (9th Cir.1978) (adjudication of a new requirement into a regulation held to be an abuse of discretion because of lack of notice).

 Thus, to determine if the choice of procedure made by the agency was an abuse of discretion, we look, in part, to the extent that the standards applied in the adjudication vary from the plain language of the rule. *Ruangswang,* 591 F.2d at 43; *see NLRB v. St. Francis Hospital of Lynwood,* 601 F.2d 404, 414 (9th Cir.1979) (NLRB policy, announced in adjudication, inconsistent with congressional purpose). We also look at the agency's prior use of rule-making and the current adjudication to see if the agency's conduct in the latter is consistent with the proceedings in the former. In *Patel v. INS,* 638 F.2d 1199 (9th Cir.1980), we noted that "by adjudication, the Board attempted to add a requirement to the 1973 regulation which had been expressly discarded during its rule-making proceedings." *Patel,* 638 F.2d at 1202 (footnote omitted). That inconsistent behavior by the INS was significant in our decision to reverse the agency's ruling on the requirements of the regulation at issue there.[13]

C. *Ready Access.*

 In the case before us, the ALJ and the Commission agreed that ready access to

---

**10.** *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 285–87 & n. 14, 294, 94 S.Ct. 1757, 1767–68, & n. 14, 1771, 40 L.Ed.2d 134 (1974) (reversal of long-held policy that buyers are management is affirmed because of inherently factual nature of the determination). For a general discussion of the significance of reviewing rules as opposed to adjudicatory decisions, *see* Robinson, *The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform,* 118 U.Pa.L.Rev. 485, 526–27 (1970), hereinafter "Robinson."

**11.** *See Morton v. Ruiz,* 415 U.S. 199, 231–38, 94 S.Ct. 1055, 1072–76, 39 L.Ed.2d 270 (1974) (no deference given to agency decision based on statutory interpretation appearing in BIA internal operations manual). We addressed the same issue in a different context in *Whaley v. Schweiker,* 663 F.2d 871 (9th Cir.1981) (Social Security Claims Manual entitled to no deference).

**12.** *See generally,* Robinson, 118 U.Pa.L.Rev. at 514.

**13.** The same factor was significant in our recent decision in *Ford Motor Co. v. FTC,* 673 F.2d 1008 (9th Cir.1981) (agency concurrently pursuing rulemaking change in required standard of conduct). Professor Davis, while critical of the *Ford* decision, acknowledges that a contemporaneous rule-making proceeding is a significant factor supporting the result in *Ford.* Davis, *Administrative Law Treatise,* § 7.25 at 183 (2d ed. Supp.1982), hereinafter "Davis." Davis's criticism of our decisions in *Ruangswang* and *Patel* seems to be based on an inadequate recognition of the facts and history relevant to those cases. *Compare Patel,* 638 F.2d at 1201–03, with Davis, § 7.25 at 179–80 (2d ed. Supp.1982).

the warranty binders, for large stores, means that one set of binders must be available on each selling floor. Wards argues that even if the distinction between large and small retailers is proper, it should have been included in the language of the rule.

We believe that such a distinction is a reasonable step by the Commission to define more specifically what ready access requires of Wards.[14] It seems clearly within the agency's discretion to make efforts to define ready access in terms of store size. The use of store size as a factor for consideration was presaged in the commentary published in the Federal Register upon the promulgation of the presale rule. 40 Fed. Reg. 60,168, 60,184 (1975).[15] As Wards was significantly involved in the rule-making process, it would be unreasonable to conclude that it was unaware of the considerations that went into the development of the rule in its ultimate form.

■ There are two troubling aspects, however, to this portion of the Commission's decision. The first is that the FTC urged both the ALJ and the Commission to require that Wards maintain a set of binders in each department. This requirement was specifically proposed and rejected in the rule-making process. See 40 Fed.Reg. at 60,1983–84. It is disconcerting that the

FTC would seek to enforce a version of the pre-sale rule that was rejected in the promulgation of the final rule.

However, this case is different from *Patel,* where we reversed the agency's appeal board after it had enforced the previously rejected standard. See *Patel v. INS,* 638 F.2d at 1202. Here, the Commission rejected the inappropriate position presented by the FTC, and applied a bright-line standard for the implementation of the ready access requirement.

The second troubling aspect of the Commission's decision is that we are not given any indication as to how that bright-line standard evolved. In the ALJ's opinion, affirmed by the Commission, there appears only the statement: "It is clear, however, that requiring consumers to go from one floor to another to examine [warranty] materials would constitute an excessive burden."

We are not informed why it is less trouble to cross a 50,000 square foot sales floor to get to a warranty binder, than it is to ride up or down an elevator or escalator. It would seem that location on the floor, relative to an elevator or escalator, would be significant. No mention of this was made, however, and we are urged by the FTC to defer to its administrative expertise in resolving the issue. See *Pacific Coast Medi-*

14. Wards's concern seems to be based on a misapprehension of what the Commission means by "large retailer." Clearly that is a reference to individual store size rather than corporate size. It would, of course, be nonsensical to require different standards of two different stores of identical physical size, merely because one is part of a two-store chain while the other is part of a two-hundred-store chain. Such a distinction would be meaningless in terms of a consumer's ready access to warranty binders.

15. The relevant portion of the commentary reads:

This sub-paragraph requires that the binders be maintained either in the department where the warranted product is sold, or in a location which provides the prospective buyer with ready access to the binders. Gambles, in its written submission, noted that "(w)hile the provision that binders be kept on a departmental basis is reasonable in the case of large retail outlets where it would be

a burden on the customer to require that he or she go to one specific location in the store to find the binders, there are many small retail outlets which may have merchandise laid out by department, yet are small enough so that one complete set at a single location in the store would suffice."

Thus, in such instances, it would be permissible to place the binders in a location other than in the departments in which the products are being sold.

40 Fed.Reg. at 60,184. We look to the above-quoted material because "[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543 -44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940) (footnotes omitted).

*cal Enterprises v. Harris,* 633 F.2d 123, 131 (9th Cir.1980). Such deference, however, is best used to resolve definitional problems. *See Todd Shipyards Corp. v. Secretary of Labor,* 566 F.2d 1327, 1331 (9th Cir.1977) (defer to administrative expertise on whether a rule relating to openings flush with the deck applies to a manhole with a six-inch-high coaming). Here we are instead dealing with a determination of how consumers will react upon discovering that a copy of a warranty may only be found on another floor.

While we do not disagree with the premise that the FTC has some expertise in consumer transactions, we would expect some indication of the source of the agency's knowledge. We have been shown no prior adjudications and no empirical analysis. The term "ready access" was apparently introduced into the rule after many retail sellers commented that a requirement of a binder in every department, as proposed by the FTC, would not be flexible enough to apply to all retail stores. 40 Fed.Reg. at 60,183–84. There does not appear to have been any discussion on what "ready access" means. *Id.*

In conclusion, however, although we are troubled by the untenable position taken by the FTC before both the ALJ and the Commission, and by the rather arbitrary decision that one set of binders is required on each sales floor in large stores, we believe that the Commission's decision was within the scope of its discretion. We hold that the Commission's decision that ready access requires Wards to place one set of binders on each sales floor was not an abuse of discretion.

D. *Sign Placement.*

█ The second major element of the Commission's decision is that Wards was ordered to place signs "in a prominent location in each department" selling products covered by the rule. Wards argues that this requirement is inconsistent with any

reasonable reading of the rule, which calls for signs in "prominent locations in the store or department ...." 16 C.F.R. § 702.3(a)(1)(ii)(B).

On this issue, the agency's commentary in the Federal Register is unenlightening. We are told only that if the warranty binders are kept at a central location, then "a prominent notice or series of notices must alert the prospective buyer's attention to the existence of the binders and the means for obtaining access to them." 40 Fed.Reg. at 60,184. We can find no basis for the Commission's conclusion that the rule requires a sign in each department.

The situation we face here is similar to one recently resolved by the Temporary Emergency Court of Appeals in *Tenneco Oil Co. v. Federal Energy Administration,* 613 F.2d 298 (Em.App., 1979). *Tenneco* involved the definition of oil "produced and sold" as it related to calculating a base period quantity for price regulation. Tenneco had produced oil at the relevant wells during the relevant period, but had sold only part of the production. The remainder was retained for the company's own use in steam generators. *Id.,* at 299–300.

The FEA found that Tenneco had improperly priced its later oil sales because it had not counted the oil it used on site as "produced and sold." The agency concluded that "sold" implies value received and that Tenneco received in-kind value through the consumption of its oil. Therefore, despite the fact that no change in title occurred, the oil used on site was "produced and sold." *See id.* at 301.

The court noted that an agency interpretation of its own rule is normally entitled to great deference.[16] However, where the interpretation ignores the commonly understood meanings of the words in the rule, closer review is required. *See id.* at 302. The court concluded that "[t]o hold that a 'sale' may occur simply in the receipt of value from property would be to rob from

---

**16.** *See Udall v. Tallman,* 380 U.S. 1, 4, 16–18, 85 S.Ct. 792, 795, 801 -02, 13 L.Ed.2d 616 (1965).

the term any legal or economic significance." *Id.* (citations omitted.)

The court acknowledged that a literal interpretation of ambiguous language may be avoided if such an interpretation would be contrary to the rule's purpose. "However, the language of the regulations must reasonably bear the intended meaning. A court cannot put its imprimatur on a regulation that was intended but never enacted." *Id.* at 303 (citations omitted). The court found no help in the history of the regulation, as the contrary interpretations of that history offered by the parties were "equally tenable." *Id.*

In concluding that it could not enforce the FEA's interpretation of "produced and sold," the court noted that "[i]f a better rule is required, the FEA is well equipped to make the necessary changes through its rule-making powers." *Id.* at 305. The court called the FEA's interpretation of the rule "plainly inconsistent" with its language and affirmed the district court's denial of enforcement. *Id.*[17]

In the situation before us, we do not find any support for the Commission's decision that the rule's language, "in the store or department," can be read to mean "in each department." The Commission reasoned that unless signs, notifying the consumer of the availability of the warranty binders, are close to the warranted product, a consumer would be likely to forget that the warranties on different products are available for comparison. Although that reasoning may be entirely rational, the result is inconsistent with the rule. "If a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." *Diamond Roofing Co., Inc. v. Occupational Safety and Health Review Comm.,* 528 F.2d 645, 649 (5th Cir.1976). *See Marshall v. Anaconda Co.,* 596 F.2d 370, 376 (9th Cir.1979) (application of *Diamond* language to an ambiguous regulation).

In addition, we also note that there was some confusion between the ALJ and the Commission on the propriety of signs affixed to cash registers in the appropriate departments.[18] The ALJ's order required Wards to utilize cash register signs, while the Commission rejected their use and intimated that they would not be recognized as "in the department" in future compliance surveys.

Part of the reason the Commission and the ALJ are unable to agree on this issue is that their argument is far afield from the plain meaning of the rule. "We reiterate that [a regulated party] should not be held to standards, the application of which cannot be agreed upon by those charged with their enforcement." *Lloyd C. Lockrem, Inc. v. United States,* 609 F.2d 940, 944 (9th Cir.1979).

In short, the Commission's decision on the sign requirements of the pre-sale rule's binder option was an abuse of discretion. If the FTC wishes to amend the rule to require signs in each department, it may do so in a formal rule-making proceeding. Until such time as the rule is amended, however, the FTC may not hold retail sellers to any standard other than that stated in the rule.

### E. Cease and Desist Order.

██ Having held that the Commission's order concerning sign placement is invalid and is thus unenforceable, we now consider the operation of the remaining portion of the order, concerning the placement of the warranty binders. We have no difficulty with the order in the respect that it announces an interpretation of the rule that is to apply in the future. Our concern is with the retroactive effect of the cease and desist order.

The Commission is allowed wide latitude in determining what type of order is neces-

---

**17.** *Cf. Sauder v. Dept. of Energy,* 648 F.2d 1341 (Em.App.1981), in which the court distinguished *Tenneco* and decided that the standard announced in an adjudication was a well-

founded amalgamation of the various applicable rules.

**18.** *See* the discussion, *supra,* at part II B.

sary to bring an end to the illegal practices found to exist. *FTC v. National Lead Co.,* 352 U.S. 419, 428–29, 77 S.Ct. 502, 508–09, 1 L.Ed.2d 438 (1957) (unfair competition); *Litton Industries, Inc. v. FTC,* 676 F.2d 364, 370 (9th Cir.1982) (false advertising). The remedy selected by the Commission, however, must have a "reasonable relation to the unlawful practices found to exist." *FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 394–95, 85 S.Ct. 1035, 1048, 13 L.Ed.2d 904 (1965). "Among the circumstances which should be considered in evaluating the relation between the order and the unlawful practice [is] whether the respondents acted in blatant and utter disregard of the law . . . ." *Standard Oil Co. of California v. FTC,* 577 F.2d 653, 662 (9th Cir.1978).

In the case at hand, the Commission's order, in substance, requires Wards to comply with the one-binder-per-floor definition of ready access. Wards argues that the cease and desist order was an abuse of discretion. The basis of Wards's position is that its good faith efforts to comply with the rule demonstrate that no "cognizable danger of recurrent violation[s]" exists. *See United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). Without some greater possibility of future violations, Wards argues, a cease and desist order is improper.

The FTC contests Wards's statements of good faith. It points out that approximately ten percent of Wards's stores were found to be in violation of the rule and that Wards's internal audit program is not yet consistent with the Commission's statement of the rule. As the Commission's order is not yet final and enforceable, *see* 15 U.S.C. § 45(g), we are not persuaded by evidence of Wards's failure to comply with it.

The FTC also argues that this case involves a cease and desist order that applies prospectively only. While we agree that a cease and desist order leads only to future sanctions, we also note that those sanctions would not be possible except for Wards's conduct prior to the Commission's explanation of ready access in its order. If the FTC had utilized its rule-making proceedings to define ready access, this retroactivity problem would not exist.[19] We must therefore examine the retroactive effect of the order relating to the placement of the binders.

In balancing a regulated party's interest in being able to rely on the terms of a rule as it is written, against an agency's interest in retroactive application of an adjudicatory decision, a good framework for analysis is set forth in *Retail, Wholesale and Department Store Union v. NLRB,* 466 F.2d 380, 390–93 (D.C.Cir.1972).[20]

> Among the considerations that enter into a resolution of the problem are (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Id.* at 390.

In considering the first three criteria, we observe that the requirement of one binder per floor was not an abrupt departure from established practice. Although this is a case of first impression, Wards's involve-

---

**19.** In *Litton* we noted that a cease and desist order is enforceable in the district court. 676 F.2d at 371. In an enforcement action, the court may assess up to $10,000 in fines for each violation. 15 U.S.C. § 45(*l*) (made applicable by 15 U.S.C. § 2310(b), which makes a violation of the Act a violation of 15 U.S.C. § 45(a)(1)).

**20.** The *Retail Union* test has been used in *McDonald v. Watt,* 653 F.2d 1035, 1043–46 (5th

Cir.1981); *E.L. Wiegand Division v. NLRB,* 650 F.2d 463, 471 & n. 5 (3d Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982); *Standard Oil Co. v. Department of Energy,* 596 F.2d 1029, 1063–64 (Temp.Emer.Ct. App.1978); *Lodges 743 and 1746 v. United Aircraft Corp.,* 534 F.2d 422, 452–54 (2d Cir.1975), *cert. denied,* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976).

ment in the rule-making process would indicate that such a requirement would not be a complete surprise, or have misled Wards from a requirement upon which it had relied. Thus, these first three factors do not weigh heavily in Wards's favor.

The fourth factor relates to the burden imposed on Wards by enforcement of the order. Because the FTC takes the position that a cease and desist order acts prospectively only, it argues that the burden on Wards, if any, is miniscule. We are directed to our decision in *NLRB v. Guy F. Atkinson Co.*, 195 F.2d 141 (9th Cir.1952), which involved approval of an order to cease and desist from recognizing a union. The nature of the order in *Guy F. Atkinson* is factually distinct, however, from that in the case at hand. There, the order dealt with a discrete restriction on contact between the employer and the union. Such an order presents a very small burden, as there is only a low potential for violation through poor oversight or inadvertence. To violate the order would almost necessarily require intentional disobedience.[21]

Wards, on the other hand, is faced with an order containing innumerable variables, collectively presenting considerable opportunity for human frailty to allow non-complying conduct. Wards must control the placement and upkeep of many hundreds of binders in stores spanning the country. Any instance of non-compliance will subject Wards to a civil penalty of up to ten thousand dollars for each violation. 15 U.S.C. § 45(*l*). In contrast, non-compliance by Wards's competitors, who have now been clearly notified that large retail stores must have at least one set of binders per floor, will not result in fines, but rather in a cease and desist order. Thus, Wards is placed at a serious disadvantage compared to its competitors because of its conduct prior to the Commission's articulation of the one-per-floor standard.

The final question in our analysis is the regulatory interest in applying the new statement of the rule retroactively. The FTC argues that its inherent authority to interpret its rules would be vitiated if we were to decide not to enforce its order here. As is apparent from our earlier discussion, it was a close question whether the Commission's restatement of the ready access requirement constituted a proper interpretive decision, or was rather an inappropriate short cut to an amendment of the rule. There is no indication that, given a clear legal duty, Wards would not fully comply. It would seem, then, that the enforcement of the order would be of minor significance to the realization of the goals of the Act and of the pre-sale rule, and would place an unfair burden on Wards. We therefore conclude that the Commission's order may not be applied retroactively.

## IV

## CONCLUSION

The Commission interprets its rule as requiring Wards to provide customers with ready access to warranty binders by placing at least one set of binders on each sales floor. We hold that the Commission's decision to issue that portion of the order was within its discretion, insofar as it applies prospectively in setting forth the standard with which Wards and other similar retailers must comply. However, the cease and desist order, which would invoke penalties under 15 U.S.C. § 45(*l*), is vacated.

We also hold that the Commission's order that requires the signs concerning availability of the binders to be placed in each department is contrary to the express language of the rule, and is, therefore, an abuse of discretion. This portion of the order is also vacated.

---

**21.** Despite the approval of the cease and desist order in *Guy F. Atkinson,* it was not enforced. The NLRB, in the meantime, certified the union as the bargaining representative, thus that portion of the order was moot. *Guy F. Atkinson,* 195 F.2d at 151.