**656**

CITIES OF ANAHEIM, RIVERSIDE, BANNING, COLTON AND AZUSA, CALIFORNIA, Petitioners,

and

City of Vernon, California, Intervenor,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

and

Southern California Edison Co., Intervenor.

No. 82–7478.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 1983.

Decided Jan. 9, 1984.

James N. Horwood, Spiegel & McDiarmid, Washington, D.C., for petitioners.

Arnold Fieldman, Washington, D.C., David B. Brearley, Vernon, Cal., for City of Vernon, Cal.

\* The Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

1. The five cities of Anaheim, Riverside, Banning, Colton, and Azusa, California have appealed together and will be referred to as "the cities." The city of Vernon has intervened and filed a short brief.

2. 16 U.S.C. § 824d(e) reads as follows:
   Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing

Joshua Rokach, Barbara Weller, Thajauna Miller, FERC, Washington, D.C., for respondent.

Brian J. McManus, Reid & Priest, Washington, D.C, for So. Cal. Edison.

Before FARRIS and REINHARDT, Circuit Judges, and SOLOMON,\* District Judge.

FARRIS, Circuit Judge:

On March 31, 1982, Southern California Edison applied to the Federal Energy Regulatory Commission for a rate increase. Five California cities, wholesale customers of Edison, intervened in opposition.[1] When a utility files a new rate schedule with FERC (formerly the Federal Power Commission), the Commission can take one of three actions:

1) It can reject the filing outright, a prerogative not explicitly provided by statute, but assumed by FERC regulation, 18 C.F.R. § 35.5, and approved in *Municipal Light Boards v. FPC,* 450 F.2d 1341, 1345–7 (D.C.Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972).

2) It can order a hearing and, in addition, may suspend the new rate for up to five months. 16 U.S.C. § 824d(e).[2]

with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order

Should the new rate go into effect before the hearing concludes, the utility may be required to refund amounts later found to be excessive. *Id.* The utility bears the burden of showing the reasonableness of its new rates. *Id.*

3) It can accept the rate schedule immediately. Then an aggrieved customer would have to file a complaint under 16 U.S.C. § 825e challenging the validity of the rates. Under this procedure the customer bears the burden of proof and has no clearly defined right to refund.

FERC has 60 days to decide which course to follow. 16 U.S.C. § 824d(d) (West Supp. 1983); *Indiana & Michigan Electric Co. v. FPC,* 502 F.2d 336, 341 (D.C.Cir.1974), *cert. denied,* 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975).

In this case FERC chose the second of the three options. On May 28, 1982, the Commission suspended step one of the proposed rate increase, the portion at issue in this appeal, for one day only. FERC also scheduled a hearing on the merits of Edison's proposal and preserved the cities' right to a refund if the rates were ultimately found excessive. *Southern California Edison Co.,* 19 FERC ¶ 61,209 (May 28, 1982). In fixing the suspension at one day, FERC purported to follow the policy set out in *West Texas Utilities Co.,* 18 FERC ¶ 61,189 (Feb. 26, 1982).

The cities petitioned for rehearing claiming that Edison's filing should have received the maximum, five-month suspension. Their petition was denied on August 2, 1982 and they filed a timely appeal.

The cities raise several issues, two of which merit extended discussion: 1) whether FERC's *West Texas* policy ought to have been adopted via rulemaking, and 2) whether FERC applied the policy improperly in this case. We hold that the *West Texas* policy was properly adopted and decline to review its application to Edison's rate proposal.

### A. The recent history of FERC's suspension policy

*West Texas* was the culmination of three years of doctrinal development triggered by the District of Columbia Circuit's opinion in *Connecticut Light and Power v. FERC,* 627 F.2d 467 (1980). There the court criticized FERC's inadequate explanation of its suspension decisions and remanded for the Commission to "establish standards for the exercise of its discretion," either by rulemaking or in "individual cases." *Id.* at 473. FERC responded by announcing in *Kansas City Power & Light Co.,* 12 FERC ¶ 61,118 (Aug. 1, 1980), that:

[R]ate filings should normally be suspended and the *status quo ante* preserved for the maximum period permitted by statute in circumstances where preliminary study leads the Commission to believe that there is substantial question as to whether a filing complies with applicable statutory standards....

Particular circumstances may warrant shorter suspensions.

Identical language appears in subsequent FERC opinions. *See, e.g., Alabama Power Co.,* 12 FERC ¶ 61,210 (Aug. 29, 1980); *Boston Edison Co.,* 12 FERC ¶ 61,211 (Aug. 29, 1980).

require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or

charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

This section was enacted as § 213 of the Federal Power Act in August, 1935, 49 Stat. 851, and was designated as § 205 of the Federal Water Power Act.

Since *Kansas City Power and Light,* FERC has found "particular circumstances" justifying a one-day suspension when preliminary analysis suggests that the proposed rates are not excessive. *Cleveland Electric Illuminating Co.,* 12 FERC ¶ 61,184 (Aug. 22, 1980); *Indiana & Michigan Electric Co.,* 13 FERC ¶ 61,241 (Dec. 18, 1980); *Appalachian Power Co.,* 14 FERC ¶ 61,027 (Jan. 16, 1981). This consistent exception to the general policy of five-month suspensions was formalized in *West Texas Utilities Co.,* 18 FERC ¶ 61,189 (Feb. 26, 1982). FERC not only made clear that the exception would continue to hold, but clarified its meaning:

> Under our restated electric rate suspension policy, a utility's increased rates will be suspended for only one day instead of the five-month maximum in those cases where our preliminary analysis indicates that no more than ten percent of the increase appears to be excessive.

No court has yet ruled on the legality of the *West Texas* policy, but Judge Robinson of the District of Columbia Circuit cited it approvingly in his concurrence in *Southern California Edison Co. v. FERC,* 686 F.2d 43, 47–8 (D.C.Cir.1982).

B. *Adjudication and rulemaking by agencies*

■ Administrative agencies are free to announce new principles during adjudication. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 290–5, 94 S.Ct. 1757, 1769–72, 40 L.Ed.2d 134 (1974); *Saavedra v. Donovan,* 700 F.2d 496, 499 (9th Cir.1983). Two exceptions qualify this general proposition. First, agencies may not impose undue hardship by suddenly changing direction, to the detriment of those who have relied on past policy. *See Ruangswang v. INS,* 591 F.2d 39 (9th Cir.1978), where the plaintiff qualified as an investor under the letter of the regulation, but faced deportation because of an adjudicatory opinion that further restricted the definition of investor status.

The adjudicatory opinion cited by the INS was published after Mrs. Ruangswang had made her initial investment. The present case stands in sharp contrast. The cities have not taken any particular action in reliance on FERC's pre-*West Texas* suspension policy. Also, *West Texas* did not abruptly change but rather strengthened and clarified a previously recognized exception to the general rule of five-month suspensions. Further, even if the cities had relied on prior policy and even if *West Texas* were a radical policy change, the hardship would be minimal because FERC preserved the cities' right to a refund.

The second limiting doctrine is that agencies may not use adjudication to circumvent the Administrative Procedure Act's rulemaking procedures. *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); *Montgomery Ward & Co. v. FTC,* 691 F.2d 1322 (9th Cir.1982); *Patel v. INS,* 638 F.2d 1199 (9th Cir.1980); *Ruangswang, supra.* This exception is inapplicable to the present case. FERC has not used *West Texas* to amend a recently adopted rule, as in *Montgomery Ward, Patel,* and *Ruangswang,* or to supplant a pending rule-making proceeding, as in *Ford Motor Co. v. FTC,* 673 F.2d 1008 (9th Cir. 1981), *cert. denied,* 459 U.S. 1008, 103 S.Ct. 358, 74 L.Ed.2d 394 (1982).

■ The cities, seizing upon broad language in *Ford Motor Co.,* 673 F.2d at 1009–10, argue that any agency principle of general application that changes existing law must pass through formal rulemaking procedures. Even if this were an accurate statement of the law, FERC's clarification of its suspension policy in *West Texas* was a minor adjustment, a fine tuning of doctrine that does not require rulemaking unless it imposes severe hardship or circumvents existing rules. By contrast, *Ford Motor Co.* involved a new interpretation of the Uniform Commercial Code that would have changed long-standing creditor practices.[3]

---

**3.** The cities also challenge the substance of the *West Texas* policy as contrary to the consumerist purposes of the Federal Power Act. But it is readily apparent that *West Texas* does not conflict with any provision of the Act. General propositions from the legislative history, such as those cited in the cities' brief, are no substitute for analysis of the Federal Power Act's

### C. Judicial review of preliminary dispositions in rate cases

■ The Federal Power Act permits review in the court of appeals for "any party . . . aggrieved by an order issued by the Commission." 16 U.S.C. § 825*l*(b). Soon after the Act was enacted, the Supreme Court narrowed the literally broad scope of judicial review by excluding procedural orders from those reviewable. *FPC v. Metropolitan Edison Co.,* 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408 (1938). The Court has never ruled on the reviewability of suspension orders or other preliminary dispositions under the Federal Power Act, but there is a wealth of precedent under analogous provisions of the Interstate Commerce Act.[4] *Arrow Transportation Co. v. Southern Railway Co.,* 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963), held that courts may not enjoin rates from taking effect after the expiration of the maximum statutory sus-

pension period. The Court said that "Congress meant to foreclose a judicial power to interfere with the *timing* of rate changes." *Id.* at 668, 83 S.Ct. at 989 (emphasis in original). *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), reversed the district court for enjoining a rate increase the Interstate Commerce Commission had declined to suspend. *"Arrow* was grounded on the lack of power in the courts to grant any injunction before the Commission had finally determined the lawfulness of the rates," wrote the Court. *Id.* 372 U.S. at 691, 93 S.Ct. at 2417. In *Southern Railway Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979), the ICC's decision not to investigate a proposed rate schedule was held not reviewable. The Court stated: "In view of this linkage [between investigation and suspension], we need look no further

particular accommodation of producer and consumer interests. *See FPC v. Memphis Light,* 411 U.S. 458, 474, 93 S.Ct. 1723, 1732, 36 L.Ed.2d 426 (1973); *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

**4.** Compare the former 49 U.S.C. § 15(7), set out below, with 16 U.S.C. § 824d(e), set out at footnote two:

Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the

rate, fare, charge, classification, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased rate or charge for or in respect to the transportation of property, the Commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, after September 18, 1940, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible.

The current analog of this section can be found at 49 U.S.C.A. § 10708.

than our previous decisions concluding that the merits of a suspension decision are not reviewable [citing *United States v. SCRAP, Arrow,* and *Aberdeen & Rockfish R. Co. v. SCRAP,* 422 U.S. 289, 311, 95 S.Ct. 2336, 2351, 45 L.Ed.2d 191 (1975).]" *Id.* at 458, 99 S.Ct. at 2396.

Numerous federal appellate panels have declined to review FERC's preliminary disposition of rate filings. In some cases, like the present dispute, customers have challenged one-day suspensions as too short. *Borough of Ellwood City v. FERC,* 701 F.2d 266 (3d Cir.1983); *City of Westfield v. FPC,* 551 F.2d 468 (1st Cir.1977), *Municipal Light Boards v. FPC,* 450 F.2d 1341 (D.C.Cir.1971). In others, customers have argued that FERC should have rejected the filing as defective on its face. *Delmarva Power & Light Co. v. FERC,* 671 F.2d 587 (D.C.Cir. 1982); *Papago Tribal Utility Authority v. FERC,* 628 F.2d 235 (D.C.Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980); *Municipal Light Boards, supra.* In one recent case, the customer challenged FERC's decision to accept a new rate schedule without a hearing. *Cities of Carlisle v. FERC,* 704 F.2d 1259 (D.C.Cir.1983). Utilities have attacked five-month suspensions as too long, without success. *Southern California Edison Co. v. FERC,* 686 F.2d 43 (D.C.Cir.1982); *Delmarva Power and Light, supra.*

The rationale for the unreviewability doctrine is straightforward and well-articulated. *See Papago,* 628 F.2d at 238–44. Preliminary dispositions of rate cases are not final decisions on the reasonableness of proposed rates. FERC has at most 60 days to decide on suspension. To subject a rough, preliminary decision to judicial scrutiny, especially where the final rate decision is reviewable, would disrupt the administrative process unnecessarily. Further, the discretionary phrasing of 16 U.S.C. § 824d(e) argues for judicial deference, *Southern Railway,* 442 U.S. at 456–9, 99 S.Ct. at 2395–96 (construing the analogous Interstate Commerce Act), as does the risk of non-uniformity wrought by uncoordinated rulings of various circuits. *See Arrow,* 372 U.S. at 663, 83 S.Ct. at 986 (discussing the origins of the ICC's rate suspending powers). Finally, customers are protected by the right to a refund with interest, accrued at the prime rate and compounded quarterly. 18 C.F.R. § 35.19a(a)(2). The cities argue that "forced loans" irreparably harm them regardless of subsequent refunds. Even if this is true, it has never been found decisive. In fact, most of the plaintiffs—*e.g.,* the competing carriers in *Arrow,* the utility plaintiffs, and the customers in cases where no suspension had been ordered—were not protected by refunds, but were still denied judicial review.

The cities argue that FERC misapplied its own *West Texas* criteria in this case and erred by failing to make summarily certain corrections proposed by the cities and acceded to by Edison. Faced with the formidable weight of policy and precedent supporting unreviewability, the cities rely on *Connecticut Light and Power v. FERC,* 627 F.2d 467 (D.C.Cir.1980), the same case that stimulated the development of FERC's suspension policy culminating in *West Texas.* FERC had explained its five-month suspension of Connecticut Light and Power's rates with boilerplate language, stating only that the rates "have not been shown to be just and reasonable and may be unjust, unreasonable, unduly discriminatory, or otherwise unlawful." Observing that identical language had been used to justify a one-month suspension in a contemporaneous case, the court said, "Indistinguishable rationales for differing results constitute no rationale at all," and remanded. *Id.* at 471.

*Connecticut Light and Power* carved out an exception to unreviewability that threatens to swallow the rule. In reviewing the reasons given for distinguishing between similarly situated plaintiffs, courts can dig deep into the merits of the contested rates, especially since the suspension standard refers to the ultimate reasonableness of the rates. The District of Columbia Circuit has moved to preserve the rule of unreviewability. Judge Wilkey, author of *Connecticut Light and Power,* wrote in *Delmarva Power & Light,* 671 F.2d at 595:

At oral argument Delmarva claimed that the reasons given by FERC were

illogical and inconsistent, and that giving illogical and inconsistent reasons was tantamount to giving no reasons at all. However, we cannot see how reviewing the consistency and logic of an order is anything but reviewing its merits—especially in this case, where doubt exists that the Commission's actions lack consistency and logic.

We follow the D.C. Circuit and refuse to extend *Connecticut Light and Power.* We will not review FERC's suspension decision under the guise of examining the adequacy of its reasons. There will be ample opportunity to correct any agency abuses after a decision on the merits of Edison's proposed rate increase.[5]

Affirmed.

REINHARDT, Circuit Judge, concurring:

I concur in the majority opinion, except for the portion contained in footnote 3. In that footnote the majority summarily dismisses a question raised by the cities that deserves our consideration. The cities challenge the *West Texas* policy on its merits, contending that the policy is contrary to consumers' interests and therefore contrary to the Federal Power Act itself.

There is some merit to petitioners' argument. The suspension policy set forth in *West Texas* permits rate increases that preliminary studies show to be excessive by up to ten percent to go into effect before FERC determines their lawfulness.[1] Because agency evaluation is often protracted, the final determination of the validity of an increase may not issue for several years. As petitioners point out, in the event that a rate increase is later determined to be excessive, customers will, in effect, have been lending money to the utilities. Although section 205(a) of the Federal Power Act, 16 U.S.C. section 824d(a) provides that refunds with interest may be ordered for rate increases subsequently found to be unreasonable, because of the time lapse between a rate increase and a refund there is no guarantee that all of the original lenders, *i.e.,* those who paid the excessive rates, will be among the actual recipients of the subsequent refund. Moreover, the cities note with justification that they are in no position, in these times of tight fiscal budgeting, to advance funds to utilities, funds that could better be used for much needed public services.

The cities also contend that the ten percent margin of error rule encourages utilities to file two-step or phased-in rate increases to circumvent the maximum suspension period by keeping the initial partial rate increase at or just below the ten percent figure.

It is FERC's contention that in its *West Texas* policy, it has attempted to strike a balance between the consumers' interest in not advancing funds for excessive rates and the utilities' interest in implementing cost-justified rate increases which can never be recouped after a suspension.

As we observed at footnote three, this avenue of judicial review is unavailing. *West Texas* does not contravene the governing statutes.

---

**5.** While courts are properly hesitant to invade FERC's zone of discretion, they are free to construe the governing statutes that define the scope of FERC's authority. In *Otter Tail Power Co. v. FERC,* 583 F.2d 399 (8th Cir.1978), *cert. denied,* 440 U.S. 950, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979), the court examined whether a rate filing was a "new rate" under the terms of 16 U.S.C. § 824d. The Supreme Court addressed the same issue under an analogous provision of the Interstate Commerce Act in *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978). In *Indiana & Michigan Electric Company v. FPC,* 502 F.2d 336 (D.C.Cir.1974), *cert. denied,* 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975), the Commission had effectively lengthened the maximum five-month suspension period by impermissibly postponing the start of the suspension. The court reversed.

**1.** The *West Texas* approach involves a preliminary analysis of a proposed rate increase. Where it appears that the increase is more than ten percent in excess of costs plus the permissible rate of return, the rate increase is suspended for the full five-month statutory maximum period and the utilities must bear the risk of error. In cases where preliminary analysis suggests that the rate is no more than ten percent above actual costs plus the permissible rate of return, the rate is suspended *pro forma* for one day before being implemented and the risk, though a lesser one, shifts to consumers.

The Commission also contends that the *West Texas* policy benefits the consumer by providing an incentive for utilities to file lower rates which can be cost justified. It is the Commission's view that a flexible suspension policy with the prospect of one day suspensions for increases which exceed preliminary estimates of appropriate rates by ten percent or less encourages utilities to follow closely Commission rate-making precedents and to request only those rate increases that can be cost-justified.

Congress' primary purpose in enacting the Federal Power Act was protection of consumers from excessive rates and inadequate service. *Federal Power Commission v. Sierra Pacific Power Co.,* 350 U.S. 348, 355, 76 S.Ct. 368, 372, 100 L.Ed. 388 (1956) ("That the purpose of the power given the Commission by section 206(a) is the protection of the public interest, as distinguished from the private interests of the utilities, is evidenced by the recital in section 201 of the Act that the scheme of regulation imposed is 'necessary in the public interest.' "); *Maine Public Service Company v. Federal Power Commission,* 579 F.2d 659, 664 (1st Cir.1978) ("The primary purpose of this mechanism is to protect consumers from excessive rates and charges—any protection received by a utility is incidental."); *Municipal Light Boards v. Federal Power Commission,* 450 F.2d 1341, 1348 (D.C.Cir.1971); *Towns of Alexandria Minnesota v. Federal Power Commission* 555 F.2d 1020, 1028 (D.C.Cir.1977); *see also, Atlantic Refining Co. v. Public Service Commission,* 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959). Bearing this objective in mind, I have some doubts as to whether FERC should balance the interests of consumers and utilities and permit the implementation of rate increases that preliminary study suggests exceed the rate justified by the underlying costs. Furthermore, it is unclear why the rate is not reduced to the level that appears to be appropriate under FERC's preliminary cost estimates instead of permitting a rate that may be up to ten percent higher to become effective.

The issue before us, however, is not whether other policies might be preferable, but simply whether the Commission has abused its discretion in adopting the *West Texas* policy. The scope of our review is very limited; we apply an abuse of discretion standard in determining whether the policy is consistent with FERC's statutory mandate. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–14, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). Despite my reservations concerning the part of the justification for the policy that involves balancing the interests, in the absence of data documenting the impact of *West Texas* on rates, or persuasive evidence that the policy will not accomplish the pro-consumer purpose suggested by FERC, I believe we must defer to FERC's technical expertise in ratemaking and accept its analysis that, by providing an incentive for utilities to file rates which are closely aligned with costs, the *West Texas* policy benefits consumers. *See Kester v. Campbell,* 652 F.2d 13, 15 (9th Cir.1981). Accordingly, I conclude that the adoption of the *West Texas* policy was within the discretion of the Commission.