Yongyouth RUANGSWANG and Vanapar Ruangswang, Petitioners,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 77–2375.

United States Court of Appeals, Ninth Circuit.

Nov. 2, 1978.

Michael D. Ullman (argued), Beverly Hills, Cal., for petitioners.

Karin H. Brettauer, Asst. U. S. Atty. (argued), Los Angeles, Cal., for respondent.

Before WALLACE and SNEED, Circuit Judges, and ENRIGHT,* District Judge.

WALLACE, Circuit Judge:

Mrs. Ruangswang attempted to qualify as an "investor" pursuant to 8 C.F.R. § 212.8(b)(4) (1974). She and her husband petition for review of an order denying their application for adjustment of status. We reverse and remand.

---

\* Honorable William B. Enright, United States District Judge, Southern District of California, sitting by designation.

1. Many of the statutory provisions applicable to this case were amended by the Immigration and Nationality Act Amendments of 1976, Pub. L.No. 94–571, 90 Stat. 2703 (1976); where material changes were made, citations in this opinion are to the legislation in force at the time this action arose.

I

The facts, insofar as they affect this review, are not in dispute. Petitioners, Mr. and Mrs. Ruangswang, are both natives and citizens of Thailand. They were admitted to the United States on August 14, 1971, with authorization to remain until January 31, 1975, the husband as a nonimmigrant student and the wife as the spouse of a nonimmigrant student.

On June 3, 1974, petitioners submitted applications for adjustment of status pursuant to section 245 of the Immigration and Nationality Act, 8 U.S.C. § 1255 (1970).[1] The District Director denied the applications on March 17, 1975. The Immigration and Naturalization Service (INS) subsequently issued an order to show cause and notice of hearing to each petitioner. The orders charged that they had remained in the United States for a longer time than permitted, and that each was thus deportable pursuant to section 241(a)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2) (1970). Although at their deportation hearing both petitioners admitted the charges against them and conceded deportability, the hearing officer continued the hearing to enable the petitioners to submit their renewed applications for adjustment of status.

At the continued hearing, as she had in her earlier application, Mrs. Ruangswang claimed to be exempt from the labor certification requirement of section 212(a)(14) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(14) (1970),[2] because she believed she was an "investor" within the meaning of the INS investor regulation, 8 C.F.R. § 212.8(b)(4) (1974). Mr. Ruang-

---

2. Section 212(a)(14) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(14) (1970), as it then read, stated in part:

(a) General classes.

Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

. . . .

(14) Aliens seeking to enter the United States, for the purpose of performing skilled

swang claimed exemption under 8 C.F.R. § 212.8(b)(2) (1974)[3] as the spouse of an investor alien, and his status is thus dependent upon that of his wife. The hearing officer denied these applications, and the Board of Immigration Appeals (Board) affirmed.

The central question to be decided thus involves whether Mrs. Ruangswang qualifies under the INS investor regulation which, at the time pertinent to this case, read in part:

> (b) *Aliens not required to obtain labor certifications.* The following persons are not considered to be within the purview of section 212(a)(14) of the Act and do not require labor certification: . . . (4) an alien who establishes . . . that he is seeking to enter the United States for the purpose of engaging in a commercial or agricultural enterprise in which he has invested, or is actively in the process of investing, capital totaling at least $10,000, and who establishes that he has had at least 1 year's experience or training qualifying him to engage in such enterprise.

8 C.F.R. § 212.8(b)(4) (1974).

The pertinent factual background for this decision began in early 1974 when Mrs. Ruangswang purchased AAA Coin Operated Dry Cleaning, Inc. (AAA) for a total purchase price of $11,000. She made an initial $2,000 payment in mid-January 1974, and subsequent payments of $4,000 in February 1974, $3,000 in March 1974, and $2,000 in April 1974. A bill of sale of AAA to Mrs. Ruangswang was executed on March 18, 1974, and by the time of her hearing, she had made a total investment of approximately $13,300.[4] This met the minimum investment amount required for qualification under section 212.8(b)(4). Mrs. Ruangswang also demonstrated that she had the requisite experience and training prescribed by the INS investor regulation: she had worked for AAA for approximately one and one-half years prior to purchasing it, she completed a dry cleaning course of four months' duration, and she was licensed as a dry cleaning operator by the State of California.[5]

The INS does not contest these facts or that Mrs. Ruangswang has met the objective requirements of section 212.8(b)(4). Instead, it argues that merely meeting these objective criteria is insufficient to qualify one for investor status, and thus for exemption from labor certification. This was the position of the District Director when he denied the Ruangswangs' original applications for adjustment of status, the hearing officer when he denied the renewal applications, and the Board when it affirmed the decision of the hearing officer. In order to understand this contention, some review of the regulations and their applicability is necessary.

or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.

3. Subsection (2) of 8 C.F.R. § 212.8(b) (1974) provided in part:

. . . The following persons . . . do not require a labor certification: . . . (2) a spouse . . . accompanying . . . his spouse . . . who either has a labor certification or is a nondependent alien who does not require such a certification . . .

4. Mrs. Ruangswang's initial investment, including the purchase price, was apparently $12,300; she subsequently invested another $1,000 in the business.

5. The record also reveals that Mrs. Ruangswang had received the degree of Bachelor of Accountancy from Chulalongkorn University, Thailand, and had worked for just over two years at Siam Motors Co., Ltd., Bangkok, Thailand, with responsibilities in budgeting and financial review.

## II

Prior to amendment in 1973 (1973 regulation), the investor regulation (pre-1973 regulation) did not specify objective criteria, but rather required only that the investment be "substantial." 8 C.F.R. § 212.-8(b)(4) (1973). From 1967 through 1973, the INS applied this regulation pursuant to the standards set forth in the Board's decision in *In re Finau*, 12 I. & N.Dec. 86 (B.I.A. 1967). In 1974, the Board decided that these standards were no longer appropriate:

In *Finau* we held that the requirement of the old regulation regarding the investment of a "substantial amount of capital" did not mandate an absolute minimum capital outlay, but rather that the term "substantial" embraced a relative concept necessitating that the investment must be substantial only in relation to the total capital requirements of the particular enterprise. We also examined the skills which the alien possessed and considered the likelihood of success of the enterprise, even though these factors appear to be quite unrelated to whether a given investment is "substantial" or not. However, in view of the rationale behind the enactment of section 212(a)(14), we are convinced that the *Finau* approach to the regulation is unsatisfactory.

*In re Heitland*, 14 I. & N.Dec. 563, 566 (B.I.A.1974), *aff'd*, 551 F.2d 495 (2d Cir.), *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977). Although *Heitland* was decided subsequent to the promulgation of the 1973 regulation which is involved in the case before us, the Board based its decision on the pre-1973 regulation. The case established new standards for determining whether or not a given investment was "substantial," as that word was used in the pre-1973 regulation.

The investment must be more than a mere conduit by which the alien seeks to enter the skilled or unskilled labor market. Consequently, the investment either must tend to expand job opportunities and thus offset any adverse impact which the alien's employment may have on the market for jobs, or must be of an amount

adequate to insure, with sufficient certainty, that the alien's primary function with respect to the investment, and with respect to the economy, will not be as a skilled or unskilled laborer.

14 I. & N.Dec. at 567.

Although the 1973 regulation which was applicable to Mrs. Ruangswang's application has substituted objective standards for the subjective "substantial" language contained in its predecessor, the Board decided in its adjudication of this case that the test announced in *Heitland* is still applicable to Mrs. Ruangswang. The question before us is whether the Board applied the correct law. We conclude that it did not.

## III

We are aware that, as the INS argues, courts must give "great deference" and "controlling weight" to an agency's interpretation of its own regulations. *E. g.*, *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). That doctrine is inapplicable, however, when the agency's interpretation " 'is plainly erroneous or inconsistent with the regulation.' " *United States v. Larionoff, supra,* 431 U.S. at 872, 97 S.Ct. at 2156 (quoting *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)). We have thus refused to defer to an agency construction that "is clearly contrary to the plain and sensible meaning of the regulation." *Hart v. McLucas*, 535 F.2d 516, 520 (9th Cir. 1976). What is clear in this case is that the interpretation of the INS is contrary to the plain language of the regulation, and that there was no reason for Mrs. Ruangswang to expect, when she sought to comply with the regulation, that the requirements for receiving an adjustment of status would be anything other than the objective criteria set forth in the 1973 regulation.

Hence, under principles of agency interpretation, the Board's application of the law cannot be sustained. The objective criteria of the 1973 regulation were clearly met by Mrs. Ruangswang. There simply is no

room for the agency to interpret the regulation so as to add another requirement.

Our review of whether the proper law was applied, however, does not end when we determine that the added requirement is not justified by agency interpretation. We must still consider whether the Board may establish the standards that it sought to apply by the adjudicatory proceedings in this case and have them bind Mrs. Ruangswang.

## IV

Through a series of cases commencing with its second decision in *SEC v. Chenery Corp. (Chenery II),* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 995 (1947), the United States Supreme Court has held that administrative agencies may properly use adjudication to "announc[e] and [apply] a new standard of conduct," *id.* at 203, 67 S.Ct. at 1580. In *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), Justice Fortas, speaking for a plurality of four, stated that although the NLRB could not, in light of the Administrative Procedure Act, establish binding prospective rules by adjudication, it could establish a new standard of conduct that would be binding on the parties before it in any particular case, and that such adjudications could have stare decisis effect.

More recently the Court again considered this question, and, relying heavily on the two former cases, held that the adjudicative forum can often be used to announce new principles applicable to the specific parties before the NLRB in particular cases, even if the principles involve a change from past policies. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 290–95, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). The Court cautioned, however, that "there may be situations where the Board's reliance on adjudication would

amount to an abuse of discretion or a violation of the Act . . . ." *Id.* at 294, 94 S.Ct. at 1771. The Court suggested that the "adverse consequences ensuing from . . . reliance [upon the NLRB's past decisions may be] so substantial that the Board should be precluded from reconsidering the issue in an adjudicative proceeding." *Id.* at 295, 94 S.Ct. at 1772. Adjudication might also be inappropriate where "some new liability" results from "past actions which were taken in good-faith reliance on Board pronouncements," or where "fines or damages" are involved. *Id.*

While the Court favors, whenever possible, the use of prospective quasi-legislative rule-making powers to formulate new standards rather than ad hoc adjudication, *see, e. g., Chenery II, supra,* 332 U.S. at 202, 67 S.Ct. 1575; *NLRB v. Majestic Weaving Co.,* 355 F.2d 854, 860 (2d Cir. 1966), we have not received definitive limits on agency [6] use of adjudicative proceedings to change course in midstream. We are, however, convinced that what the Board seeks to do in this case is beyond the bounds of that which is permissible under *Bell.* The adverse consequences—voluntary departure at best, and deportation at worst—are certainly substantial. In the sense that the requirement added to the 1973 regulation prevents an adjustment of status, there is some new liability. Finally, if there was good faith reliance on the 1973 regulation, *Bell* militates against allowance of the adjudication method.

## V

The Board relies upon *Mehta v. INS,* 574 F.2d 701 (2d Cir. 1978). That case provides a starting point for our analysis. There, the court affirmed the Board's decision to apply the *Heitland* criteria to the 1973 regulation. Among other things,[7] the court

---

6. In this case the "agency" is the Department of Justice, because both the Immigration and Naturalization Service and the Board of Immigration Appeals are arms of the Department. *See* 8 U.S.C. § 1101(a)(34) (1976) (Immigration and Naturalization Service); 8 C.F.R. § 3.1(a)(1) (1978) (Board of Immigration Appeals).

7. The court also considered the necessity of Federal Register publication of adjudicative opinions, such as *Heitland,* that overrule prior precedent, and the doctrine that changes in administrative policy must be accompanied by "a 'clear and well reasoned analysis for the change in interpretation.'" *Mehta v. INS,* 574 F.2d 701, 705–06 (2d Cir. 1978). In view of our

concluded, citing *Chenery II,* that an agency generally has discretion to determine whether to proceed by rule-making or ad hoc adjudication, and that proceeding by adjudication was not unfair to Mehta in the circumstances of his case.[8] *Id.* at 705. As pointed out by the Second Circuit, *Heitland* was decided "almost a year before Mehta purchased his business in an attempt to establish investor status." *Id.* This notice is obviously significant to the disposition in *Mehta.* But it is this vital factual difference that distinguishes *Mehta* from the case before us. In fact, *Heitland* did not provide the necessary notice to Mrs. Ruangswang.[9]

■ Whether there was adequate notice so that the agency did not abuse its discretion must be determined by focusing upon the date of purchase. *See Mehta v. INS, supra,* 574 F.2d at 705.[10] In some cases, discrete questions may arise in establishing that date because of the dates upon which various amounts are paid, or problems of documentation. Here we do not believe that precise definition is necessary.

Mrs. Ruangswang made her initial investment of $2,000 in January 1974; *Heitland* was not decided until January 25, 1974.

Although the bill of sale was not executed until March 18, and the $10,000 threshold was not exceeded until April, it is difficult to see how, under these circumstances, she could be expected to have had notice of the Board's "interpretation" of the applicable 1973 regulation because of *Heitland.* This becomes especially clear when we center our concern on the knowledge with which Mrs. Ruangswang could be charged when she made her investment.

First, the INS had recently amended its investor regulation, setting forth seemingly objective criteria, which she met. Second, on the date of her initial capital outlay, there was no *Heitland* law or dictum that could have led her to conclude that more was required than the objective criteria stated in the regulation. Even if she had investigated the history of the 1973 regulation, she would have only become aware that in promulgating its amendment to the investor regulation, the INS had explicitly decided to omit language strikingly similar to that which the Board would now insert by this adjudication.[11] The unexplained specific eradication of substantially the

---

disposition of this case, we need not consider these issues or the Second Circuit's resolution of them.

8. As to this issue, the court did not base its analysis on *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), *supra,* or any other stated authority.

9. We thus do not pass on the question of whether an agency may ever use adjudication to undo what it has done by rule-making. *See also Texaco, Inc. v. FPC,* 412 F.2d 740, 744–45, 745 n.10 (3d Cir. 1969).

10. Since the relevant factor in determining adequacy of notice in any given case is prejudice to the party before the agency, *see NLRB v. Bell Aerospace Co., supra,* 416 U.S. at 295, 94 S.Ct. 1757, this type of case is distinguishable from rate-making cases where the party is prejudiced only at the time that an application is filed, and only if the party has not had sufficient notice to file the necessary data and to prepare a case. *See, e. g., Central Arkansas Auction Sale, Inc. v. Bergland,* 570 F.2d 724 (8th Cir.), *cert. denied,* 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1121 (1978); *Boston Edison Co. v. FPC,* 181 U.S.App.D.C. 222, 557 F.2d 845, *cert. denied,* 434 U.S. 956, 98 S.Ct. 482, 54 L.Ed.2d 314 (1977).

11. Specifically, the original proposal for the amendment would have required that the relevant enterprise "reasonably be expected to be of prospective benefit to the economy of the United States and not intended solely to provide a livelihood for the investor and his family." 38 Fed.Reg. 1379–80 (1973). That language was omitted without explanation.

In 1976 the INS again amended the investor regulation, this time explicitly to include an employment requirement, and to raise the minimum investment threshold to $40,000. 41 Fed. Reg. 37565–66 (1976). Interestingly, when promulgating the 1976 revision, the INS declared that the employment requirement was not a change "because the investor exemption was never intended to apply to an alien who was making an investment in an enterprise which would provide only a means of livelihood for himself and his family in competition with citizens and permanent resident aliens having similar investments in like enterprises in this country." *Id.* at 37566. We find this comment difficult to square with the language of the 1973 regulation and its history referred to above.

same added investor requirement during rule-making and the subsequent effort to reestablish the requirement by adjudication require us to be especially concerned whether the INS gave adequate notice to Mrs. Ruangswang.

 Applying the standards of *Bell,* we hold there was an abuse of discretion in attempting to establish a new standard based upon *Heitland* and applying it to Mrs. Ruangswang by the adjudicatory process.[12] *Cf. Boston Edison Co. v. FPC,* 181 U.S.App. D.C. 222, 557 F.2d 845, 849, *cert. denied,* 434 U.S. 956, 98 S.Ct. 482, 54 L.Ed.2d 314 (1977) (in a rate-making case, agency "acted arbitrarily and abused its discretion in applying a standard contrary to its existing regulations").

### VI

 We thus conclude that the Board improperly applied the law to Mrs. Ruangswang's application for adjustment of status, whether it was attempting to create a new standard of conduct by adjudication or believed that it was merely interpreting the relevant regulation. Mrs. Ruangswang

therefore qualifies for investor status, and her husband also qualifies for exemption from labor certification as her spouse. This does not, however, resolve the matter completely.

When the hearing officer denied the Ruangswangs' applications for adjustment of status, he also determined that, assuming statutory eligibility, "their application would be denied as a matter of discretion." *See generally* 8 U.S.C. § 1255 (1970). The Board stated that, in view of its disposition of the adjustment of status claim, consideration of the discretion question was unnecessary. We therefore reverse and remand so that the Board may consider this question.

REVERSED AND REMANDED.

SNEED, Circuit Judge:

I concur in Judge Wallace's opinion.

Adjudication by an agency to establish a rule or policy inconsistent with its recently adopted regulation suggests administrative confusion and uncertainty. The costs of this inefficiency should not always be borne by the individual being governed. An in-

---

**12.** The INS argues that the *Heitland* standards are as applicable to the 1973 regulation as they are to the pre-1973 regulation because the 1973 amendment "attempted only to clarify and strengthen the previous requirements for investor status" and because the "amendment did not change the congressional intent behind 8 U.S.C. 1182 with which the . . . amended regulation must be consistent."

We agree that the amendment did clarify the regulation to the extent that it established objective criteria. Whether the amendment was an attempt to "strengthen" the regulation is not at issue; Mrs. Ruangswang met the clarified standard.

We also agree that the regulation must be consistent with the statutory policies embodied in the Immigration and Nationality Act. While the INS' reading of the regulation is certainly consistent with the policy of protecting American labor against an influx of aliens entering the United States seeking employment, H.R. Rep. No. 1365, 82d Cong., 2d Sess. (1952), *reprinted in* [1952] U.S.Code Cong. & Admin. News 1653, 1705, a literal reading of the objective criteria prescribed in the 1973 regulation is *not inconsistent* with that policy. There is certainly no indication that the INS thought otherwise when it promulgated the amended regula-

tion without the language originally proposed. *See* note 11 *supra.*

That the INS could have made the regulation stricter is not important. As we recently observed, numerous authorities hold "that federal courts will require federal agencies to abide by the agency's own regulations, *even where the regulations are more generous than required by law." United States v. Newell,* 578 F.2d 827, 834 (9th Cir. 1978) (emphasis supplied). In any event, it is a "general principle that an agency is to be held to the terms of its regulations." *United States v. Coleman,* 478 F.2d 1371, 1374 (9th Cir. 1973) (citations omitted). *See, e. g., Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *Vitarelli v. Seaton,* 359 U.S. 535, 539–40, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *see also* Note, *Violations by Agencies of Their Own Regulations,* 87 Harv.L.Rev. 629, 631 (1974). On balance, the ill effect on the Ruangswangs from the Board's establishment of a standard without adequate notice outweighs any possible mischief done to the statutory design by our literal reading of the regulation based upon the facts of this case. *See generally Chenery II, supra,* 332 U.S. at 203, 67 S.Ct. 1575.

stance in which society should bear these costs is where the individual had no reason to know that the word of the regulations is not the will of the agency. I think such a situation exists in this case.