Manning STOLLER, Petitioner,

v.

COMMODITY FUTURES TRADING COMMISSION, Respondent.

No. 1113, Docket 86–4175.

United States Court of Appeals, Second Circuit.

Argued May 7, 1987.

Decided Nov. 23, 1987.

Christopher Lovell, New York City (Christopher Lovell, P.C., New York City, of counsel), for petitioner.

Whitney Adams, Deputy Gen. Counsel, Commodity Futures Trading Com'n, Washington, D.C. (Marshall E. Hanbury, Gen. Counsel, Pat G. Nicolette, Deputy Gen. Counsel, Robin Rosenbluth, Washington, D.C., of counsel), for respondent.

Before OAKES, NEWMAN, and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

Manning Stoller ("Stoller"), a registered account executive with a commodities brokerage firm, petitions for review of a decision and order entered in an administrative enforcement proceeding before the Commodity Futures Trading Commission (the "Commission"). The administrative complaint charged Stoller and others with en-

gaging in "wash sales" in violation of section 4c(a)(A) of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 6c(a)(A). The Commission found that Stoller had engaged in prohibited transactions, *see In re Collins*, [1986–87 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 22,982 (Apr. 6, 1986) (hereinafter *Collins I*), and subsequently clarified its opinion in response to a request by the Chicago Mercantile Exchange, *see In re Collins*, [1986–87 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,401 (Nov. 26, 1986) (hereinafter *Collins II*). For the reasons stated below, we grant Stoller's petition and reverse the Commission's order.

## BACKGROUND

This case concerns trading practices on the New York Mercantile Exchange (the "NYMEX") relating to May 1976 Maine potato futures contracts (the "Contracts"). The transactions in question occurred on May 5 and 6, 1976, during the last few days of trading in the Contracts, and were entered into on Stoller's instructions on behalf of his own account and those of six of his customers.

As would later be shown, *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), the market price of potato futures was being artificially depressed at that time by an illegal conspiracy. The conspirators planned to reap large profits when the May potato crop proved to be less plentiful than they were leading the market to believe, thereby causing the price of the futures contracts to rise. *See id.* at 369–70, 102 S.Ct. at 1834–35. In the end, holders of many Contracts failed to deliver potatoes on the specified dates, "resulting in the largest default in the history of commodities futures trading in this country." *Id.* at 367, 102 S.Ct. at 1834 (citations omitted).

In early May 1976, however, the details of this fraudulent scheme were still unknown. It apparently is clear that Stoller sensed that artificial forces were being brought to bear upon the market and recognized that the market price of the Contracts was below the level that would oth-erwise be indicated by an anticipated short supply of potatoes. Further, it appears that Stoller consequently believed that the artificial depression of the market would cease, either through official intervention or by investors' realization that the potato crop would be small. Futures prices would then rise, thereby creating a profit for those holding fixed-price "long" contracts to receive delivery of potatoes in May 1976.

NYMEX regulations specified that commodity deliveries were to be made first to those who had held their futures contracts the longest, with holders of the most recently acquired contracts receiving their deliveries last. Thus, when the price of the cash crop is expected to rise during the period when deliveries are made, it likely would be profitable to acquire long contracts very shortly before the close of trading in order to "get behind [i.e. at the end of] the delivery line." Those like Stoller who already owned Contracts, and who therefore expected to have to take early delivery of potatoes, probably in mid-May, would likely prefer to sell their existing Contracts and to acquire newer ones, which would entitle them to take delivery instead in late May or early June, when the value of the commodity was expected to be higher. Stoller claims that this "rollover" or "roll forward" was a commonly-used practice in Maine potato futures.

On May 5 and 6, 1976, Stoller placed orders with floor brokers to sell existing Contracts, which carried early delivery dates because of the length of time for which they had been held, and to replace them one-for-one with other Contracts at a price as near as possible to the price for which the old ones were sold. By virtue of owning newly-acquired Contracts, Stoller and his customers would be entitled to later delivery dates under applicable NYMEX regulations. The transactions were designated "market not held", which Stoller asserts signified that the floor broker was entitled to exercise discretion in placing the orders so as to minimize the price differential, but would not be held liable for any losses resulting from an error in judgment. Stoller further claims that the

brokers were instructed to liquidate the old positions before acquiring the new ones, thereby subjecting him to market risk in the intervening period.

The Commission brought a three count enforcement proceeding against Stoller in June 1977, alleging, *inter alia,* that these virtually simultaneous sale and repurchase transactions at substantially the same price constituted "wash sales" within the prohibitory language of section 4c(a)(A) of the Act, 7 U.S.C. § 6c(a)(A). The Division of Enforcement moved for summary disposition in May 1978, which Stoller opposed on the ground that there were genuine issues of material fact to be resolved. In his opposition papers, Stoller sought a factual hearing at which he might seek to substantiate his claims that "roll forward" trading was a common industry practice and that his "market not held" instructions did not demonstrate an intent not to engage in a bona fide market transaction. He also cross-moved for summary disposition, claiming that his conduct could not constitute a "wash sale", as that term had been applied in prior cases almost exclusively in the context of prearranged trading or other collusive action. Both motions were denied: the Division of Enforcement's because of the existence of factual questions, and Stoller's as premature because the Division of Enforcement was entitled to seek to produce evidence that would support its allegations. *See* [1977–80 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,909 (August 23, 1978); No. 77–15 (CFTC Sept. 15, 1978).

In May 1979, when the Division of Enforcement still had not produced significant additional evidence, Stoller again moved to have the charges against him dismissed. In August 1979, the administrative law judge ("ALJ") granted summary disposition in favor of Stoller on the ground that he had demonstrated a legitimate market purpose to the transactions, thereby excluding them from the intended scope of the "wash sales" prohibition. [1977–80 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,908 (Aug. 16, 1979). In November 1979, the ALJ denied a motion by the Division of Enforcement to reconsider his August ruling. In February 1984, following

the dismissal for lack of evidence of the other two counts of the complaint against Stoller, the Division of Enforcement appealed to the Commission from the ALJ's order with respect to the wash sale allegations, and in April 1986, almost ten years after the trades in question were executed, the Commission reversed the ALJ's decision and entered judgment against Stoller. In its decision, it said, "We infer from his conduct that [Stoller] initiated transactions with the intent to create the appearance of genuine purchases and sales while avoiding any bona fide market transaction." *Collins I* at 31,903.

The Chicago Mercantile Exchange requested a clarification of this decision on the ground that *Collins I* seemed to prohibit transactions in which the parties seek to minimize market risk. *See* [1986–87 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,112 (June 18, 1986). The Commission modified its holding and explained that it only sought to prohibit transactions that did not expose the principals to *any* risk of market price fluctuation. *Collins II* at 33,078. Nevertheless, it reaffirmed its decision that Stoller had violated this prohibition. This case never progressed beyond the stage of summary disposition; and no factual hearing was ever held at which Stoller would have had the opportunity to establish his defense that he did not have the requisite intent to avoid a bona fide market transaction.

## DISCUSSION

Stoller's appeal raises two primary challenges to the proceedings before the Commission. First, he asserts that summary disposition was improperly granted against him because of the existence of material factual disputes. Second, he claims that the Commission did not provide adequate prior notice to the commodities industry and the public that the conduct in question would be considered to constitute prohibited "wash sales". We agree with both of his contentions.

### A. *Summary Disposition*

█ The Commission decided this case on appeal from cross-motions for summary

disposition filed pursuant to 17 C.F.R. § 10.91(a). Because there were significant disputes as to material facts, this disposition was inappropriate. *RKO General, Inc. v. FCC,* 670 F.2d 215, 226 n. 32 (D.C. Cir.1981) ("Before an agency may use such [summary] procedures, it must be able to show that evidentiary hearings could serve no purpose."); *Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 244 (2d Cir.1984) (dispute over question of intent may exist even where parties agree on facts concerning their actions).

Stoller's response to the Division of Enforcement's motion for summary disposition clearly sets forth genuine questions of fact, including whether Stoller instructed the floor brokers to sell the old Contracts before purchasing new ones; whether he intended to minimize or to negate risk; and what the industry practice was concerning sales to "get behind the delivery line". The determination of these issues is critical in order to ascertain whether Stoller had the requisite intent to avoid a bona fide market transaction. The Commission even concedes that to show a violation, the Division of Enforcement "must demonstrate that respondent knowingly participated in transactions initiated with intent to avoid a *bona fide* market position." *Collins II* at 33,077; *Collins I* at 31,899–900; *see also In re Goldwurm,* 7 Agric.Dec. 265, 274 (1948) ("The essential and identifying characteristic of a 'wash sale' seems to be the intent not to make a genuine, bona fide trading transaction. . . .").

Under normal circumstances, the improper resolution of a case on summary judgment is grounds to remand the case for further proceedings. *See Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d at 244 (questions of intent should be left to factfinder); *Koppel v. Wien,* 743 F.2d 129, 135 (2d Cir.1984) (same). However, remand is not appropriate in this case because, as we discuss below, we consider the absence of adequate prior notice of the Commission's construction of the term "wash sale" to constitute an incurable defect in the proceedings.

### B. *Transactions Within the Scope of "Wash Sale"*

■ The term "wash sale" is not defined in the Act itself, in any applicable regulations, or in any interpretive releases. The Commodity Exchange Authority (the "CEA"), the predecessor organization to the Commission, had advised commodities merchants and floor brokers by memorandum in 1948 that it considered trading to "get behind the delivery line" to constitute a "wash sale". However, this document was not published as an interpretive release but merely accompanied a copy of the *Goldwurm* decision that was circulated to commodities brokers shortly after the decision was rendered. In 1959, in another unpublished memorandum to the brokers, the CEA repeated this position. The CEA took the same position with respect to "roll forward" trading in an *internal* 1955 memorandum and in a 1971 letter to the Chicago Mercantile Exchange. However, we do not consider these documents to be sufficient to apprise the public at large of the rule interpretation, particularly when the policy apparently remained unenforced for years and the allegedly proscribed conduct apparently remained commonplace, as is asserted in this case. *See generally NLRB v. Majestic Weaving Co.,* 355 F.2d 854, 860–61 (2d Cir.1966) (Friendly, J.) (where conduct generally recognized as permissible in industry, agency adjudication of retroactive invalidity may be arbitrary).

■ An agency is free, of course, to interpret its governing statute case by case through adjudicatory proceedings rather than by rulemaking. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 292–94, 94 S.Ct. 1757, 1770–71, 40 L.Ed.2d 134 (1974); *SEC v. Chenery Corp.,* 332 U.S. 194, 201–03, 67 S.Ct. 1575, 1579–80, 91 L.Ed. 1995 (1947). In so doing, it may "announc[e] and apply[ ] a new standard of conduct." *SEC v. Chenery Corp.,* 332 U.S. at 203, 67 S.Ct. at 1580. However, if the Commission suddenly changes its view, as we discuss below, with respect to what transactions are "bona fide trading transactions," it may not charge a knowing violation of that revised standard and thereby cause undue

prejudice to a litigant who may have relied on the agency's prior policy or interpretation. *Cities of Anaheim, Riverside, Banning, Colton & Azusa, California v. FERC,* 723 F.2d 656, 659 (9th Cir.1984) (citing *Ruangswang v. INS,* 591 F.2d 39 (9th Cir.1978)).

Like the ALJ, we are unaware of any prior instances in which the Commission had sought sanctions against anyone who engaged in futures trading that accomplished only a modification of the delivery date of the commodity. The 1948 and 1959 memoranda from the CEA to floor brokers and the 1955 internal CEA memorandum were not generally available to the public; nor does the Commission assert that they were well-known to the commodity futures community. The 1971 letter to the Chicago Mercantile Exchange was sent to an exchange other than the one on which Stoller's alleged trading violations occurred. None of these documents was formally promulgated as an administrative interpretation or incorporated in adjudicative decisions. Thus, even if Stoller had investigated the Commission's view of "roll forward" trading, it seems unlikely that he would have been able to tell from that inquiry alone that such action was impermissible. *See Ruangswang,* 591 F.2d at 45; *cf. McKenzie v. Bowen,* 787 F.2d 1216, 1222 (8th Cir.1986) (new interpretation upheld where interpretive guidelines were contained in agency's internal operations manual, publicly available for inspection and copying). The apparently commonplace nature of such trading, *see* 1 P. Johnson, *Commodities Regulation* § 2.29, at 261 (1982); *see also Collins II* at 33,078, combined with the absence of enforcement, would further buttress a reasonable inference that the conduct was permissible.

The various prior decisions on the subject of "wash sales" had concerned transactions that were virtually risk-free, often prearranged, and intentionally designed to mislead, *see, e.g., Sundheimer v. CFTC,* 688 F.2d 150 (2d Cir.1982); *In re Platt,* 24 Agric.Dec. 93 (1965), or to serve other illicit purposes, *see, e.g., In re Goldwurm,* 7 Agric.Dec. at 275 (offsetting transactions to create artificial tax losses); *In re Eisen,* 22 Agric.Dec. 758 (1963) ("accommodation trades"). The transactions in this case, by contrast, are claimed to have been designed only to minimize risk and to fulfill a purpose generally considered legitimate in the industry. Consequently, a broker might well believe the conduct in this case to be factually distinguishable from the Commission's prior case law; and indeed the ALJ acknowledged this distinction in propounding a "legitimate market purpose" test herein for conduct alleged to constitute "wash sales". [1977–80 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,908, at 23,-688.

In *Collins I,* the Commission took the same position that it had expressed in its earlier memoranda, namely that all "roll forward" trading intended solely to alter the delivery date of the underlying commodity was prohibited because it did not result in any change in the holder's market position. When the Chicago Mercantile Exchange voiced its concern at this prohibition, the Commission began to reassess its position, claiming, for example, that its 1971 letter to the Chicago Exchange, despite clear language to the contrary, did not express a per se rule. *See* [1986–87 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,112, at 32,283 n. 2 (June 18, 1986). In *Collins II,* the Commission backed away from the sweeping language of *Collins I* and instead held that trading to "get behind the delivery line" might be permissible if the contract holder only sought to minimize but not to negate market risk by the transaction.

At oral argument before this Court, counsel for the Commission conceded that a market sale followed by instructions to repurchase the same quantity at the closest possible price would not constitute a "wash sale" because the individual would be exposed to the risk of market fluctuation between the trades. *See also Collins II* at 33,078 ("[T]ransactions structured to minimize rather than negate risk ... do not violate Section 4c(a) merely because the transaction also serves to change the individual's position in the delivery line."). The Commission contends, however, that the preceding scenario is inapplicable to this case because Stoller's "market not held" instruction somehow operated to ne-

gate the risk entirely. *See Collins I* at 31,903.

The Commission may well have the power to construe the statute in such a subtle and refined way, but the public may not be held accountable under this construction without some appropriate notice. *See Ruangswang,* 591 F.2d at 45. The Commission first held that all "transactions which give the appearance of a bona fide purchase and sale, while avoiding any actual change in ownership" are illegal. *See Collins I* at 31,899. It then revised its interpretation, claiming that the statute only prohibits transactions that negate market risk. *See Collins II* at 33,078. The fact that the Commission abruptly changed its own interpretation in the middle of the proceedings in our judgment further demonstrates the need both for a clearer and more explicit interpretation and for appropriate notice thereof to the public as to what conduct is permissible. Because we find that the public was not adequately apprised that the Commission views "roll forward" trading to be encompassed within the "wash sale" prohibition, we conclude that Stoller may not be held liable under that interpretation for his alleged violations with respect to the Contracts at issue herein.

The petition for review is granted and the Commission's order is reversed.