945 F.2d 398
 1992-1 Trade Cases P 69,719
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
SID GOODMAN & COMPANY, INCORPORATED, Petitioner,
v.
UNITED STATES Of America, United States Department of
Agriculture, Agricultural Marketing Service,
Clayton Yeutter, Secretary, U.S.
Department of Agriculture, Respondents.
 No. 90-2209.
 United States Court of Appeals, Fourth Circuit.
 Argued May 6, 1991.
Decided Oct. 1, 1991.
 
 On Petition for Review of an Order of the United States Department of Agriculture (89-523-D)
 Argued: Geoffrey Richard W. Smith, McDermott, Will & Emery, Washington, D.C., for petitioner; Leslie Karen Lagomarcino, Office of the General Counsel, United States Department of Agriculture, Washington, D.C., for respondents.
 On Brief: Edward M. Ruckert, Matthew C. Rosser, McDermott, Will & Emery, Washington, D.C., for petitioner; James Michael Kelly, Associate General Counsel, Raymond W. Fullerton, Assistant General Counsel, Margaret M. Breinholt, Deputy Assistant General Counsel, Office of the General Counsel, United States Department of Agriculture, Washington, D.C., for respondents.
 
 
 1
 Dept. of Agr.
 
 
 2
 AFFIRMED.
 
 
 3
 Before WIDENER, and NIEMEYER, Circuit Judges and JOSEPH H. YOUNG, Senior United States District Court Judge for the District of Maryland, sitting by designation.
 
 OPINION
 PER CURIAM:
 
 4
 Goodman & Sons, Co. Inc. ("Goodman") is a Maryland corporation and a wholesale distributor of agricultural produce, located at the Maryland Wholesale Produce Market in Jessup, Maryland. Goodman is a licensed perishable agricultural commodities dealer, pursuant to the licensing requirements of the Perishable Agricultural Commodities Act ("PACA"). It purchases produce in wholesale lots from outof-state shippers and sells the produce in wholesale quantities to customers in the District of Columbia and Baltimore areas. Goodman also accepts produce on consignment from out-of-state shippers and sells it on consignment in the District of Columbia and Baltimore areas. Magruder, Inc. ("Magruder") and Fresh Value, Inc. ("Fresh Value") are among Goodman's customers.
 
 
 5
 M. Offutt Co., Inc., a Texas produce shipper, requested that the Agricultural Marketing Service ("AMS") of the United States Department of Agriculture ("USDA") investigate Goodman's business, seeking reparation from Goodman for five lots of produce that Goodman handled for it on consignment.
 
 
 6
 The investigation uncovered accounting and reporting deficiencies that led to the discovery that Goodman "surreptitiously" made 25 cents per-package payments to the employees of Magruder and Fresh Value, in order to induce those employees to purchase produce from Goodman rather than from a competitor.[1]
 
 
 7
 From January 1987 through September 1988, these payments to Bill Crandall, Assistant Vice President and Produce Buyer for Magruder, totalled more than $66,000 for the produce Crandall purchased from Goodman on behalf of Magruder's fourteen retail grocery stores. From April 1987 through September 1988, Goodman issued checks totalling $41,000 to the wife of Henry Hernandes, the produce buyer for Fresh Value's four retail supermarkets.
 
 
 8
 The supervisors at Fresh Value and Magruder were unaware of the payments. The invoices and accountings did not reflect the payments and Goodman clearly did not tell them. In addition, neither Crandall nor Hernandes reported to their superiors the payments received for purchasing the products. As a result of the investigation, AMS determined that Goodman had failed to make full and prompt payment to M. Offutt Co. of over $5000.[2]
 
 
 9
 Although both stores have policies forbidding employees from taking gifts or gratuities of any kind, there was evidence that employees of both stores received promotional gifts offered publicly by suppliers on an incentive basis to the retail food industry. These gifts included sports tickets, pens, bottles of wine, hats, and jackets.
 
 
 10
 On April 18, 1989, AMS issued a complaint against Goodman alleging that Goodman willfully, flagrantly, and repeatedly violated section 2(4) of the Act, 7 U.S.C. § 499b(4) by regularly and surreptitiously giving employees of two wholesale customers a total of more than $107,000 to induce those employees to buy perishable agricultural commodities from Goodman. On May, 10, 1989, Goodman filed an answer denying violation of PACA and a motion for a more definite statement of the violations alleged. Goodman also asserted that Magruder and Fresh Value extorted the kickback payments by threatening not to purchase perishable agricultural commodities from Goodman if it did not make the per-package payments to their buyers.
 
 
 11
 In its more definite statement of the issues, the agency charged Goodman specifically with violations of the first three unnumbered clauses of section 2(4) of the PACA.[3] The complaint thus alleged that Goodman made fraudulent, false, or misleading statements in connection with transactions involving perishable agricultural commodities; failed or refused truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity; and failed to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction.
 
 
 12
 Following a hearing, the Administrative Law Judge ("ALJ") concluded that Goodman willfully violated section 2(4) of the PACA. The ALJ found that Goodman's reporting, accounting, and payment violations arose out of its surreptitious payments to the its customers. He further found that Goodman violated the PACA (1) by making false statements on the invoices it submitted to its customers, Magruder and Fresh Value; (2) by making false statements in accounting to its consignors and by failing to account truly and correctly, or to make full payment promptly to those consignors; and (3) by failing to perform an implied duty owed by Goodman to its wholesale customers and by not informing those customers of the perpackage kickback payments made to their employees. The ALJ ordered publication of these facts and also revoked Goodman's PACA license on the grounds that the violations were flagrant and repeated.
 
 
 13
 On May 2, 1990, Goodman appealed the ALJ's decision to USDA's Judicial Officer ("JO"). Goodman argued that the ALJ erred in concluding that section 2(4) of the PACA establishes an implied duty to refrain from making surreptitious kickback payments to employees of a PACA licensee's customers and that its due process rights were violated by the imposition of such a duty. Goodman also argued that the ALJ's findings of violations were not supported by substantial evidence on the record.
 
 
 14
 The JO adopted the ALJ's Decision and Order as final. Goodman filed a petition for review with this Court on September 25, 1990. By Order dated October 29, 1990, the JO stayed the revocation of Goodman's PACA license pending the outcome of the appeal.
 
 
 15
 * Goodman does not contest that it marked up the price by 25 cents per-package on produce sold in wholesale lots to Magruder and Fresh Value. Nor does it dispute that it paid 25 cents per-package to the produce buyers employed by Magruder and Fresh Value in order to induce them to buy from Goodman rather than from a competitor. Further, Goodman admits that it concealed the mark-up from both Magruder and Fresh Value, and that it omitted the mark-up from the invoices it submitted to its consignor, M. Offutt Co. However, Goodman argues that the plain language of the statute makes no mention of payments, bribery or corruption and that the statute addresses omissions and not obligations.
 
 
 16
 The plain language of the statute is the point at which interpretation commences. Mallard v. United States District Court, 490 U.S. 296, (1989). The broad statutory language reflects the breadth of the PACA:
 
 
 17
 It shall be unlawful in or in connection with any transaction in interstate or foreign commerce-- ... (4) ... or to fail, without reasonable cause, to perform any specification or duty, expressed or implied, arising out of any undertaking in connection with any transaction ..." (emphasis added).
 
 
 18
 7 U.S.C. § 499b(4).
 
 
 19
 The key word is "any." Congress' intention to regulate the perishable commodities market is shown by its failure to specify individual transactions which it considered to be unlawful. This term is all encompassing to include all unlawful transactions without exception. The implied duty clause broadens the scope of the Act to afford the Secretary the authority to exercise the expertise and discretion necessary to regulate specialized problems that may arise in the perishable agriculture commodities industry on a case-by-case basis. "Congress used the terms '... express and implied duties ...' rather than specify all practices that would be a violation of the PACA, for that is an impossible task." JO's Dec. at 21. The PACA's regulations state:
 
 
 20
 It is impracticable to specify in detail all of the duties of brokers, commission merchants, joint account partners, growers' agents and shippers because of the many types of businesses conducted. Therefore, the duties described in these regulations are not to be considered as a complete description of all of the duties required but is merely a description of their principal duties. The responsibility is placed on each licensee to fully perform any specification or duty, express or implied, in connection with any transaction handled subject to the Act. 7 C.F.R. § 46.26 (1989).
 
 
 21
 The Secretary found that commercial bribery[4] was a violation of the PACA's implied duty clause. The Secretary has consistently enforced the PACA to ensure that members of the industry deal fairly with one another at arm's length. See United Fruit and Vegetable Co., 40 Agric. Dec. 396, 402 (1981), aff'd sub nom. United Fruit and Vegetable Co. v. Dir. of Fruit and Vegetable Div., 668 F.2d 983 (8th Cir.1982) (enforcing prompt payment requirements to assure financial responsibility in industry); The Connecticut Celery Co., 40 Agric. Dec. 1131, 1137-38 (1981) (prohibiting changes after a contract is made in order to ensure that parties deal on equal terms). Thus, Goodman had an implied duty to deal fairly with other members in the industry.
 
 
 22
 This Court must be deferential to the agency's construction of the statute that Congress entrusted to its administration. Chevron v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). In reviewing an agency's construction of a statute, a court must give effect first to the unambiguously expressed intent of Congress. If Congress has not addressed the precise issue,
 
 
 23
 the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.... A court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.
 
 
 24
 Id. at 843-44.
 
 
 25
 Although the statute specifically prohibits Goodman's behavior pursuant to the fraudulent statement provision, discussed below, and also pursuant to the implied duty provision, the legislative history indicates that PACA was enacted to regulate the entire perishable agricultural commodities industry, not solely the relationship between the growers and the shippers. This is indicated by PACA's strict accounting and payment requirements, which were intended to assure financial integrity among all members of the produce industry. Courts enforce these requirements strictly to further the Act's goal of ensuring "that only financially responsible persons should be engaged in the businesses subject to the Act." Marvin Tragash Co. v. United States Dep't of Agric, 524 F.2d 1255, 1257 (5th Cir.1975); Citrus Co. v. Goldstein, 214 F.Supp. 823, 827 (E.D.Pa.1963) ("Clearly the Act was intended to regulate all persons who operate in the business of dealing with perishable agricultural commodities in interstate commerce.").
 
 
 26
 The plain language of the statute and legislative history clearly support the administrator's construction of the statute. Kickback payments made to gain an unfair advantage over one's competitors disadvantages the producers, the consignors and the consumer. Thus, Goodman had an implied duty to deal fairly with its competitors and by paying kickbacks, Goodman's competitors were held at an unfair advantage.
 
 II
 
 27
 Goodman's constitutional arguments are also without merit. Goodman argues that the implied duty clause provides no specifications of what types of implied duties are owed under the Act. It maintains that where an agency attempts to apply statutes or regulations to conduct not intended to be encompassed by those provisions, the agency action must be invalidated for a lack of fair warning. Diamond Roofing Co. v. Occupational Safety and Health Review Comm'n, 528 F.2d 645, 649 (5th Cir.1976). Courts are primarily concerned that vague statutes allow those enforcing them to exercise unfettered discretion, id. and Kolender v. Lawson, 461 U.S. 352, 357 (1983), and Goodman argues the PACA's vagueness would permit courts to consider all conduct by licensees to be a violation of a statute.
 
 
 28
 The United States Supreme Court held that a statute must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties ... [and] a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.
 
 
 29
 Connally v. General Constr. Co., 269 U.S. 385, 391 (1925); Sorenson v. Nat'l Transp. Safety Board, 684 F.2d 683, 686 (10th Cir.1982) (licensees are "entitled to be informed with reasonable certainty and explicitness of the standards by which [their] license[s] may be revoked"). The Supreme Court applies an objective test and interprets a statute designed to regulate business activities according to what "a business person of ordinary intelligence" would understand to be innocent or proscribed conduct. Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 501 (1982).
 
 
 30
 The Secretary's construction of the implied duty clause to proscribe commercial bribery will not entrap licensees engaging in innocent conduct; it is aimed only at preventing unfair conduct designed to undermine the industry's stability. It does not proscribe legal activity.
 
 
 31
 Goodman also argues that the JO confused Goodman's void-forvagueness due process argument with traditional procedural due process arguments concerning notice and that the Department's Order must be set aside since the JO failed to consider one of the two constitutional due process arguments raised. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1930) (decision is arbitrary and capricious if the agency has ... failed to consider an important aspect of the problem). Goodman's constitutional argument was two-fold: (1) the statute is to provide explicit standards so that law enforcement officials and administrative agencies are not free to institute arbitrary actions, the void-for-vagueness argument discussed above; and (2) traditional due process requires that those already charged with violations of some provision be adequately apprised of the actual charges against them so that they may have an opportunity to defend themselves. Goodman contends that the JO failed to address the second argument, specifically, that its due process right had been infringed because no statute, regulation or Department policy statement had provided adequate guidance, prior to the institution of the proceeding, as to what behavior could be considered a violation of the implied duty clause. In other words, it argues that the Department did not provide notice to it of its views on payments to retailers' purchasing agents.
 
 
 32
 Goodman relies upon Stoller v. CFTC, 834 F.2d 262 (2d Cir.1987) for the proposition that new law may not be made by adjudication where agency attempted to enforce a prohibition on "wash sales" without having statutory definition of the term, even though several letters distributed to floor brokers stated that the conduct engaged in by the respondent was a prohibited "wash sale".
 
 
 33
 Stoller is inapposite. Stoller acknowledged that an agency is free to interpret its governing statute case-by-case through adjudicatory proceedings rather than rulemaking, id. at 265, and held that an agency cannot revise an established standard in an adjudicatory proceeding to the detriment of a litigant who relied on the agency's prior policy or interpretation. Id. at 265-66. Here, the established standard was to protect the integrity and efficiency of the perishable commodities market and all unlawful transactions are a violation of that standard. There was no revision of that standard at the hearing. Unfair practices, such as commercial bribery, are clearly a violation of that standard.
 
 
 34
 This Court's scope of review of "an administrative order wherein a new principle is announced and applied is the same as that which pertains to ordinary administrative action.... Our duty is at an end when it becomes evident that the Commission's action is based upon substantial evidence and is consistent with the authority granted by Congress." Id. at 207. The Court's review of the sanctions imposed by the Secretary is more limited than its review of the findings of violations.
 
 
 35
 [W]here Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy "the relation of remedy to policy is peculiarly a matter of administrative competence." American Power Co. v. SEC, 329 U.S. 90, 112 (1946).
 
 
 36
 Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 185 (1973).
 
 
 37
 The statute provides adequate notice to Goodman that payments made to induce its customers to purchase produce, an otherwise illegal activity, would be prohibited.
 
 III
 
 38
 Goodman disputes the JO's finding that it violated section 2(4) of the PACA because its invoices were "false statements" as prohibited by the PACA. It argues that the invoices were submitted solely to reflect the amount of money owed to Goodman for deliveries of produce to Magruder and Fresh Value. Goodman also argues that the Court must find that in making the 25-cent payments in these transactions, Goodman "fraudulently obtained" money from the supermarkets to return to their agents, rather than merely negotiating a price for the produce and making a payment from its own profits.
 
 
 39
 The invoices omitted the 75-cent mark-ups and the 25-cent kickback, and therefore failed to accurately represent the amount Goodman received for the sale of the produce. The $107,000 worth of commercial transactions made pursuant to wholesale sales to Magruder and Fresh value were also concealed. Thus, the invoices were made "for a fraudulent purpose, [a] false or misleading statement in connection with ... transaction[s] involving [a] perishable agricultural commodity ... sold in [interstate] commerce ..." 7 U.S.C. § 499b(4).
 
 
 40
 Whether the money was paid from Goodman's profits or its customers' pockets is irrelevant. Goodman's actions of inducing a customer to purchase produce from it is commercial bribery irrespective of where the inducement comes from.
 
 IV
 
 41
 Goodman maintains that its conduct was not "willful" as statutorily required and that even if its violations were willful, the Secretary's decision to revoke its license was arbitrary and capricious since he could not have found such conduct to be "flagrant or repeated."
 
 Section 499h(a) provides that:
 
 42
 [w]henever (a) the Secretary determines, as provided in section 499f of this title, that any commission merchant, dealer, or broker has violated any of the provisions of section 499b of this title, ... the Secretary may publish the facts and circumstances of such violation and/or, by order, suspend the license of such offender for a period not to exceed ninety days, except that, if the violation is flagrant or repeated, the Secretary may, by order, revoke the license of the offender ...
 
 
 43
 In Hutto Stockyard, Inc. v. USDA, 903 F.2d 299, 304 (4th Cir.1990), the Court held that " 'willfulness', for the purposes of section 558(c) means an 'intentional misdeed or such gross neglect of a known duty as to be the equivalent thereof'." Goodman argues that it had no awareness that such conduct constituted a violation of the Act because of the lack of regulations, policy statements, or a pattern of prior prosecutions.
 
 
 44
 Goodman's argument is meritless. As discussed above, Goodman should have known that illegal inducements to purchase its produce violates its implied duty to deal fairly and at arms-length.
 
 
 45
 The record demonstrates that Goodman systematically paid 25 cents per package kickbacks and that these kickbacks were omitted from the invoices in an intentional attempt to deceive Magruder, Fresh Value and M. Offutt Co. These acts fall within the "intentional misdeed" provision of section 499(b). Goodman surreptitiously paid kickbacks to its produce buyers for a period of approximately a year and a half. Such acts are clearly flagrant and repeated on a weekly basis.
 
 This case is
 
 46
 AFFIRMED.
 
 
 
 [1]
 Sales to Magruder indicated a 75 cents discrepancy between the invoice price and the price reported by Goodman to M. Offutt Co. Goodman received 25 cents more from the customer than it was reporting and paying to M. Offutt Co. This sum was given to the customers' employees to induce them to purchase produce from Goodman. Fifty cents was reported as freight costs
 
 
 [2]
 Goodman later compensated Offutt for this underpayment
 
 
 [3]
 Section 499b provides in pertinent part:
 It shall be unlawful in or in connection with any transaction in interstate or foreign commerce ...
 (4) For any commission merchant, dealer, or broker to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction involving any perishable agricultural commodity which is received in interstate or foreign commerce by such commission merchant, or bought or sold, or contracted to be bought, sold, or consigned, in such commerce by such dealer, or the purchase or sale of which in such commerce is negotiated by such broker; or to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had; or to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction; or to fail to maintain the trust as required under section 499e(c) of this title.
 
 
 [4]
 Commercial bribery is "the offer of consideration to another's employee or agent in the expectation that the latter will, without fully informing his principal of the 'gift,' be sufficiently influenced by the offer to favor the offeror over other competitors." 2 Callman, The Law of Unfair Competition Trademarks and Monopolies § 49 (3rd ed. 1968) (ALJ Dec. at 20)